757 P.2d 1185

**Lois HUGHES, on Behalf of Joseph Alexander HUGHES, Plaintiff–Appellant,**

**v.**

**UNION PACIFIC RAILROAD COMPANY, Defendant–Respondent.**

**No. 16994.**

Supreme Court of Idaho.

June 17, 1988.

Goicoechea Law Offices, Pocatello, for plaintiff-appellant. James F. Combo argued.

Green, Service, Gasser & Kerl, Pocatello, for defendant-respondent. F.L. Ringe argued.

BAKES, Justice.

Appellant, Joe Hughes, age 13, was injured when his feet were caught in the coupler between two railroad cars while he was crossing the Union Pacific Railroad (UPRR) yard in Pocatello, Idaho. Appellant brought suit against UPRR. Upon a special verdict, the jury found that appellant was more than 50% negligent in causing his own injuries. Pursuant to I.C. § 6–801 the district court entered judgment for the defendant UPRR. The court denied appellant's motion for judgment notwithstanding the verdict and new trial. Appellant appeals. We affirm.

## I

The UPRR Shipping and Receiving Yard lies in the heart of downtown and residential Pocatello. It runs for approximately three miles, separating east Pocatello from west Pocatello. Much of the yard is enclosed by a chain link/barbed wire fence, eight feet in height. When the fence was built in early 1984, Roche Moving & Storage Company, a business on the east border of the railroad yard, requested access to the side of their building through the fence. In compliance, UPRR left a 3½ foot opening next to the Roche building, but no gate was ever installed.

Three roads cross over the railroad yard; at issue here is the Benton Street overpass, which returns to ground level near the north side of the Roche building.

On March 15, 1986, appellant, his brother Tom, age 15, and another friend, Dan Gill, also age 15, were walking from the east side of town to a birthday party on the west side. As they were walking on the sidewalk starting over the Benton overpass, Dan suggested instead that they go under the overpass, crossing through the railroad yard as he had done earlier that day.[1] Appellant's older brother Tom replied, "No. It's dangerous." Nevertheless, appellant testified that he thought "it

---

1. Appellant admitted that he had previously observed train movement in the railroad yard; that he had never seen anyone crossing the tracks in the Benton overpass area; and that he had never heard of anyone crossing in that area before March 15, 1986. Even though no signs were posted indicating the land's status as private property, appellant had never previously tried to enter UPRR's property or looked for a way to get in.

would be a challenge, just kind of be fun," so appellant and Tom followed Dan and they entered the railroad yard through the gap in the fence next to the Roche building. They continued across the tracks in a relatively straight line, crossing several lines of train cars either by going over the couplers or by crawling under the cars. When crawling under, appellant testified he would make the maneuver near the middle of the car because if the train happened to start rolling, he didn't want to be close to the wheels.

Eventually they approached the last string of cars. Tom and Dan had seen this last string move while they were still two or three tracks away. In addition, Tom testified he had heard it move. The string was now stopped, but Tom felt uneasy about the situation and said to appellant, "Joe, let's go back." Appellant responded, "No. I'll meet you on the other side." Tom turned back, exiting the railroad property where he had entered. Tom walked over the Benton overpass alone while Dan and appellant went on. In negotiating the last train, Dan climbed up between two cars, stood on the coupler, and jumped off. Appellant attempted to cross in the same manner, even though he had previously heard loud booms off to his left. As he stood on the coupler, however, the train moved and his feet were injured by the coupling mechanism.

Appellant filed suit against UPRR for his injuries. He alleged that UPRR knew that individuals were crossing its tracks under the Benton overpass and, despite that knowledge, negligently failed to place a gate in the unfenced areas or to place signs on their property warning the public of the dangers of the railroad yard and that trespassing was prohibited. He also alleged that the railroad yard and the equipment maintained thereon were attractive nuisances and that his injuries were caused by UPRR's negligence in maintaining an unsafe condition.

In its answer UPRR denied plaintiff's allegations and alleged as an affirmative defense that appellant's injuries were due to his own negligence. At the close of the evidence, UPRR moved for a directed verdict alleging: (1) that appellant failed to establish his claim under the attractive nuisance doctrine; and (2) that appellant's own negligence was equal to, if not greater than, UPRR's as a matter of law. The district court denied the motion for a directed verdict with respect to the negligence issue and advised that it would rule on the attractive nuisance issue *via* the jury instructions. At the jury instruction conference, the court refused plaintiff's requested Instruction No. 20 on the attractive nuisance doctrine. In addition, the court instructed the jury that, as a matter of law, the railroad was not obliged to place signs on its property indicating its status as private property.

The jury returned a special verdict finding appellant more negligent than UPRR. Accordingly, the court entered judgment denying appellant's claim. Appellant filed a motion for j.n.o.v. or, in the alternative, for a new trial. The motion was denied by order dated May 6, 1987.

## II

Appellant raises two issues on appeal. They concern: (A) the trial court's refusal to give appellant's requested instruction regarding attractive nuisance; and (B) the instruction given the jury regarding placement of signs indicating a tract of land's status as private property. Each issue is addressed in turn.

### A.

Appellant first argues that the trial court erred in refusing to give his requested Instruction No. 20 regarding the attractive nuisance doctrine. Appellant's Instruction No. 20 was based upon the Restatement (Second) of Torts, § 339 (1965). Idaho law regarding attractive nuisance is found in *Bass v. Quinn–Robbins Co., Inc.*, 70 Idaho 308, 216 P.2d 944 (1950). As stated in *Bass*, the attractive nuisance doctrine is applicable under the following circumstances:

"To render the owner liable the structure or condition maintained or permitted on his property, must be [1] peculiarly or

unusually attractive to children; [2] the injured child must have been attracted by such condition or structure; [3] the owner must know, or the facts be such as to charge him with knowledge, of the condition, and that children are likely to trespass and be injured; [4] the structure or condition must be dangerous and of such a character that the danger is not apparent to immature minds." 70 Idaho at 312, 216 P.2d at 945 (bracketed numbers added).

Plaintiff's requested Instruction No. 20 did not reflect the law as set out in the *Bass* case. Idaho Pattern Jury Instruction, IDJI 310, correctly incorporates each of the four elements set out in *Bass v. Quinn–Robbins Co., supra,* and when the factual circumstances justify the giving of an attractive nuisance instruction, IDJI 310, rather than plaintiff's requested Instruction No. 20, is the correct instruction to be given.[2]

■ However, even if plaintiff had requested the correct instruction, the trial court correctly ruled that the evidence introduced at trial did not justify the giving of any attractive nuisance instruction. No evidence was presented at trial to support several of the elements necessary to invoke the attractive nuisance doctrine. As enunciated in *Bass,* a *prima facie* attractive nuisance case requires a showing (1) that the condition maintained on the property was peculiarly or unusually attractive to children; (2) that the injured child was attracted by the condition or structure; (3) that the owner knows, or the facts are such as to charge him with knowledge, of the condition and that children are likely to trespass and be injured; and (4) that the condition was of such a character that the danger was not apparent to immature minds (the "danger not apparent" element). *Bass v. Quinn–Robbins Co., supra* at 312, 216 P.2d 946.

In the instant case, the condition of the railroad yard was not peculiarly attractive to children. Appellant himself testified that he had never seen anyone (let alone children) crossing the tracks in the Benton overpass area; neither had he ever heard of anyone crossing in that area before March 15, 1986, the date of his first crossing. Joe Hughes had never previously tried to enter UPRR's property, nor had he looked for a way to get in. Neither was the railroad yard attractive to children as a "shortcut"; as Dan Gill testified, going over the overpass is "quicker" than going under it. As stated in *Holland v. Baltimore & Ohio RR Co.,* 431 A.2d 597, 602 (D.C.1981), "The overwhelming weight of authority in jurisdictions across the country is that the attractive nuisance exception does not apply as a matter of law in cases where child trespassers are injured by moving trains." (Citing 19 cases.)

As to the second element, the trial court noted that there was absolutely no testimony that appellant Joe Hughes was in fact attracted to the railroad property by any condition thereon. Rather, as the trial judge noted, the testimony demonstrated conclusively that appellant went upon the railroad's property at the invitation and challenge of his companion, Dan. *Accord McCormick v. Williams,* 194 Kan. 81, 397 P.2d 392, 395 (1964), *reh'g denied* 1965 ("It is necessary that the instrumentality alleged to be an attractive nuisance should have been so situated as to entice the child onto the premises before liability could be imposed.").

Finally, even though plaintiff argued that there was conflicting testimony (appellant's mother, Lois Hughes, testified that Joe was a "mama's boy," and "really quite naive for his age"), the trial court did not err in concluding that the fourth element of

---

**2.** Appellant contends, erroneously, that Restatement (Second) of Torts § 339 (1965), was adopted as the Idaho law regarding attractive nuisance in *Daniels v. Byington,* 109 Idaho 365, 707 P.2d 476 (Ct.App.1985). In *Daniels,* the sole issue was whether summary judgment was precluded by a genuine issue of material fact. The Court of Appeals did not overrule *Bass;* indeed, it could not. In fact, the Court of Appeals cited to and quoted from *Bass.* Restatement § 339 does not state the traditional attractive nuisance doctrine, and does not reflect the law of attractive nuisance in Idaho, as set out in the *Bass* case. *Cf. Bates v. Eastern Idaho Regional Med. Center,* 114 ldaho 252, 755 P.2d 1290 (1988) (language of pertinent sections of Restatement (Second) of Torts rejected).

the attractive nuisance doctrine, the "danger not apparent" element, was not met as a matter of law. As the court held in *Holland v. Baltimore & Ohio RR Co.*, 431 A.2d 597 (D.C.1981), accidents involving moving trains fall outside the scope of the attractive nuisance doctrine because children can understand the risk involved in intermeddling with trains. The court stated:

> "There are certain obvious conditions which trespassing children can be expected to understand as a matter of law. [Footnote citing the Restatement (Second) of Torts and two moving train cases omitted.] In such cases 'the possessor is free to rely upon the assumption that any child of sufficient age to be allowed at large by his parents, and so to be at all likely to trespass, will appreciate the danger and avoid it, or at least make his own intelligent and responsible choice.' W. Prosser, Law of Torts, *supra*, § 59 at 371 [4th ed. 1971] (footnote omitted)." 431 A.2d at 603.

The court in *Holland* then held that, as a matter of law, the "danger not apparent" element of attractive nuisance was not met because a moving train is a danger so obvious that any 9 year old child allowed at large would readily discover the dangers involved in coming within the area made dangerous by it.

Regarding the "danger not apparent" element, the trial judge noted that "the injured youngster admitted that he was aware of the danger in crossing the railroad yards." By his own testimony, the 13 year old appellant admitted he was aware that crossing railroad yards was dangerous and that he had previously seen moving trains in the area beneath the Benton overpass. His knowledge is particularly shown by the manner in which he crossed over and under the railroad cars, crossing at points he deemed safest should the trains move. That he appreciated the risk inherent in the railroad yard is further borne out by his testimony that he followed Dan into the railroad yard because "it would be a challenge," even though his own brother stated before they went in, "No. It's dangerous." Appellant admitted seeing the

Roche building, the fence and the Roche trucks; he knew he was entering someone else's property. Finally, appellant chose not to turn back when his brother warned him and turned back. Appellant heard the booms, which were quite loud according to his own description, yet he continued across the yard and through the strings of train cars. The doctrine of attractive nuisance applies only "to trespassing children who, because of their youth and inexperience, are unable to appreciate the dangers created by certain artificial conditions." *Guilfoyle v. Missouri, Kansas, & Texas RR Co.*, 812 F.2d 1290, 1292 (10th Cir.1987) (doctrine not applicable to 14 year old); *Carlson v. Tucson Racket & Swim Club, Inc.*, 127 Ariz. 247, 619 P.2d 756, 758 (App. 1980), *reh'g denied* 1980, *review denied* 1980 ("Where the plaintiff is of the age and experience to appreciate the danger that produces his injury the [attractive nuisance] doctrine does not apply." Plaintiff was 16 years old.); *Joslin v. Southern Pacific Co.*, 189 Cal.App.2d 382, 386, 11 Cal.Rptr. 267, 269 (1961), *hearing denied* 1961 ("The dangers of being near a moving train … are so patent that we shall not burden this opinion with a discussion of them. Suffice it to say that we believe such dangers should have been obvious to a 12–year–old boy. It is not the purpose of the attractive nuisance doctrine to lend relief to the youngster who knows or is capable of realizing the possible calamitous consequences of a dangerous act, but nevertheless dares to undertake it.").

■ Accordingly, we affirm the trial court's denial of an attractive nuisance instruction. If any element of attractive nuisance is not established, the attractive nuisance claim fails. *Bass v. Quinn–Robbins Co., Inc.*, 70 Idaho 308, 216 P.2d 944 (1950); *Joslin v. Southern Pacific Co.*, 189 Cal. App.2d 382, 11 Cal.Rptr. 267 (1961), *hearing denied* 1961; *Holland v. Baltimore & Ohio RR Co.*, 431 A.2d 597 (D.C.1981); *see also* 65 C.J.S. *Negligence* § 63(90) (1966) (citing cases from ten jurisdictions). Since there was no evidence presented at trial establishing the existence of the essential elements of an attractive nuisance case, the

trial court was correct in not submitting an attractive nuisance instruction to the jury.

### B.

■ Appellant next contends that the trial court erred in instructing the jury that, as a matter of law, UPRR was not required to place signs on its property indicating its status as private property. Appellant is mistaken. The only authority cited by appellant is I.C. § 18–7008(9); but, I.C. § 18–7008(9) deals with criminal trespass, and criminal trespass is not an issue in this case. Thus, appellant's cited authority is inapposite. We have been cited to no authority under the instant facts which requires the owner or possessor of real property to place signs thereon indicating its status as private property. There is Idaho authority to the contrary. *Huyck v. Hecla Mining Co.*, 101 Idaho 299, 612 P.2d 142 (1980) ("We are cited to no rule of law which requires the owner or possessor of real property to place signs thereon indicating its status as private property."). In any event, appellant was aware that he was on the railroad property, and thus had actual notice, so the issue is essentially moot.

Judgment and orders affirmed. Costs to respondent. No attorney fees.

SHEPARD, C.J., and HUNTLEY and JOHNSON, JJ., concur.

BISTLINE, Justice, dissenting.

### I.

The Idaho Supreme Court has been presented with the opportunity to remedy prejudicial trial error and at the same time clarify case law which is sorely in need of being reconsidered. It does neither.

It has been said that a chain is no stronger than its weakest link. After today, it may be said of an eight-foot link/barbed-wire security fence erected to enclose a train yard, such is no better than its missing gate. The majority does not tell the reader why the fence was erected or of the railroad company's knowledge of school children coming in to the train yard, or for how long such has gone on, or why the railroad company did not bother to replace the gate. The last question remains unanswered, but one would surmise that a present-day viewer of the railroad train yard will either see a gate in place and locked, or that the former 3.5 foot opening is now fenced.

At trial railroad personnel testified to having apprehended youths who were in the yard. They also testified to it being "obvious" that youths in the railroad yard, particularly at the Benton Street area, pose some danger to those youths.

But, nevertheless no gate was installed nor was the fence made into a complete enclosure prior to the plaintiff being injured.

It was testified that on those Benton Street area encounters "field interrogation cards" would be filled out with information supplied by the juveniles as to name, date of birth, address, and guardian's name. The special agent would write in his name and the location of the encounter. (If there is any testimony in the record showing that the guardians or parents were warned by the railroad company of the children thus exposing themselves to danger, I do not find it.) The plaintiff had not ever been so "carded." Ages of six of the intruders into this danger zone, as shown by the cards retained in the file, and as testified to, were 17 years, 17 years, 16 years, 13 years, 9 years and 8 years. The witness who so testified also went on to say that he told the youngsters:

A. First of all, we identify ourselves as railroad special agents. We advise them that they are trespassing on railroad property. We advise them of the dangers involved in being in the railroad yards, the various things that could possibly happen to them. They might fall underneath the, the train cars and get run over. They could lose a limb. They could lose an arm. They could get killed.

Tr., p. 69. He did not say that the youngsters were warned that standing and apparently idle train cars might suddenly move.

Both the plaintiff youngster and the railroad were represented at trial by capable, conscientious and forthright counsel.

Counsel for the railroad asked the trial court to give this instruction of law to aid the jury in its deliberations:

### DEFENDANT'S REQUESTED INSTRUCTION NO. 22

Plaintiff has the burden of proving each of the following propositions:

1. A condition existed on the Defendant's premises which the Defendant knew, or in the exercise of ordinary care should have known, involved a reasonably foreseeable risk of attraction of and harm to children.

2. The railroad yard was peculiarly or unusually attractive to children.

3. The railroad yard was such that the danger was not apparent to immature minds.

4. The Plaintiff was attracted onto the premises by such railroad yard.

5. The Plaintiff was in the exercise of that degree of care which would be expected from an ordinary child of the same age, experience, knowledge, and discretion under similar circumstances.

6. The condition was a proximate cause of the injury to the Plaintiff.

7. The nature and extent of the injuries, the elements of damage, and the amount thereof.

If you find from your consideration of all the evidence that each of these propositions has been proved, then your verdict should be for the Plaintiff; but, if you find from your consideration of all the evidence that any of these propositions has not been proved, then your verdict should be for the Defendant.

IDJI 310.

Counsel for the plaintiff asked the trial court to give this instruction, which the majority opinion refers to as plaintiff's requested instruction number 20:

### INSTRUCTION NO. 20

A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if:

(a) The place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

(b) The condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

(c) The children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or coming within the area made dangerous by it, and

(d) The utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to the children involved, and

(e) The possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.

*Daniels v. Byington,* 109 Idaho 365, 707 P.2d 476 (App.1985) Restatement (Second) of Torts, Sec. 339 (1965)

Both are instructions pertinent to the legal theory known as the doctrine of attractive nuisance, and the term has been so referred to in the majority opinion. Both instructions were prepared by counsel who are learned in the law and who by reason of extensive discovery and legal research knew what the trial issues would be.

The trial judge's strange reaction was to not give the jury *any* such instruction. Here is what transpired: Plaintiff's counsel at the instructions conference properly registered an objection to the jury not being so instructed. Astute counsel for the railroad company on seeing which direction the judicial wind was blowing objected to plaintiff's requested instruction number 20. Without hearing again from plaintiff's counsel the trial judge did not rule on either objection, but summarily stated: "I'm going to withdraw 20. I think that's covered by the other instructions." Counsel for the railroad company was not slow in siding with the court, even though the court

had not given one iota of explanation or reasoning:

> We agree with you, Your Honor, that attractive nuisance should not go to the jury and accordingly would agree that our instructions that deal with attractive nuisance should either be withdrawn or disregarded, or at least not given.

The trial judge did not respond to that statement, but neither the railroad company's nor the plaintiff's instruction on attractive nuisance is to be found among the instructions which the court did give to the jury.

Either the plaintiff's requested instruction number 20 or the defendant's requested instruction number 22 should have been given. I cannot bring to mind a previous circumstance such as this where, when under the theories of *both* parties the law of attractive nuisance was involved, a trial judge refused to give any such instruction, or one of his own creation. Compounding that refusal is the failure to divulge any reason for so ruling.

Not to worry says Justice Bakes, in command of a majority, and he concludes that it is an appellate function to justify the trial court's unexplained ruling and what was wrong with the two similar requested instructions. But, the trial judge was specific in not having said it was wrong; he declared that it *was covered* in and by other instructions.

In doing so Justice Bakes has written that a properly rewritten requested instruction would have been IDJI 310, which I will set forth on his behalf:

IDJI 310

ATTRACTIVE NUISANCE

Plaintiff has the burden of proving each of the following propositions:

1. A [structure] [condition] existed on the [defendant's] premises which the defendant knew, or in the exercise of ordinary care should have known, involved a reasonably foreseeable risk of attraction of and harm to children;

2. The [structure] [condition] [maintained] [permitted] on the property was peculiarly or unusually attractive to children;

3. The [condition] [structure] was such that the danger was not apparent to immature minds;

4. The plaintiff was attracted onto the premises by such [condition] [structure];

5. The plaintiff was in the exercise of that degree of care which would be expected from an ordinary child of the same age, experience, knowledge, and discretion under similar circumstances;

6. The [structure] [condition] was a proximate cause of the injury to the plaintiff;

7. The nature and extent of the injuries, the elements of damage, and the amount thereof.

If you find from your consideration of all the evidence that each of these propositions has been proved, then your verdict should be for the plaintiff; but, if you find from your consideration of all the evidence that any of these propositions has not been proved, then your verdict should be for the defendant.

Justice Bakes does not discuss the evidence in this case in light of either of the two requested instructions (one by plaintiff; one by defendant), or IDJI 310, but harkens back almost 40 years to *Bass v. Quinn–Robbins Co.,* 70 Idaho 308, 216 P.2d 944 (1950), of which he says *is* Idaho attractive nuisance law, and sets it out because IDJI "correctly incorporates each of the four elements set out in *Bass* ...."

Having done so, although there is no empirical or any documentation in the record that the jury was even allowed to decide the issue, he, the Justice, simply pontificates that "the condition of the railroad yard was not peculiarly attractive to children," and "Neither was the railroad yard attractive to children as a shortcut ...." After so speaking for all children, he quotes from a District of Columbia case which involved a child's exposure to a *moving train* traveling down its own track on its own right-of-way, where one youngster on the train reached out and grabbed at the young plaintiff as the train passed by him.

The *Holland* opinion has *no* applicability to this case, other than for that plaintiff being on railroad right of way. I do note in reading *Holland* some interesting passages one of which seem to demonstrate approval for § 339 of the Restatement, which is set out in full. 431 A.2d at 601. The theme of *Holland* appears to be its adherence to the outrageous proposition that "appellant's (plaintiff's) complaint in alleging that a nine-year old child on the railroad right-of-way did not realize the danger inherent in coming within an area made dangerous by approaching freight trains, is deficient as a matter of law." *Holland* at 602. "In the instant case, as a matter of law, element (c) of the rule is not met since a moving train is a danger so obvious that any nine-year old child allowed at large would readily discover it and realize that risk involved in coming within the area made dangerous by it." *Holland* at 603.

If Justice Bakes and those who join his opinion are convinced that such is sound law, I will not attempt to persuade otherwise. Rather succor and comfort will be found by turning to page 604 of 431 A.2d for an assessment of the *Holland* decision by three judges more in tune with law which is tempered by considerations of humanity:

> The majority opinion can be summarized in one sentence: Because *all* children should know better than to go near trains, and because the costs of more carefully safeguarding a right-of-way in *any* location will always be too great to impose on a railroad, *no* child trespasser can ever recover for injuries caused by a moving train in the District of Columbia (absent wilful, wanton, or reckless conduct by the railroad). That is an extreme holding. I strongly disagree.

431 A.2d at 604 (Ferren, J., joined by Kelly and Mack, JJ., dissenting). Moreover, the *Holland* case dealt with a moving train proceeding down its own right-of-way. Our concern is with a train yard, not a right-of-way. At the time this plaintiff occupied a place of danger that place of danger consisted of *standing* boxcars.

There was no valid reason for Justice Bakes to resort to the *Holland* case. An invalid reason is to bolster an opinion weak on its law as applied to the circumstances. In *Holland* the Court of Appeals was upholding the lower court's dismissal of the plaintiff's complaint without letting him go to trial. In this case there was a jury trial where at the close of the presentation of all evidence the court *denied* a defendant's motion for a directed verdict and let the jury decide. Unfortunately, and precipitating this appeal, the trial court did not submit for the jury's consideration the law of negligence which is applicable to attractive nuisances—notwithstanding that *both* parties saw such as necessarily and properly involved. It was for the jury to decide exactly the very important issue upon which the court did not inform the jury as to the law.

For whatever reason, Justice Bakes has divined that it is his duty to uphold the court's failure, and to supply reasoning which the trial court did not even touch upon. It is a thoughtful gesture, true, but entirely out of keeping with acceptable appellate procedures. For certain it makes the appellate process into a mockery and works a great injustice.

The plaintiff in this case filed a demand for jury trial, which means that the issues are to be decided by a fairly and properly instructed jury. No fault here is attributable to the respective attorneys. What we see here was the unusual circumstance of a judge creating his own error by not giving an instruction which both parties have seen as appropriate. That can happen where a trial court acts under constraints of time and apparently feels justified in his unexplained actions. That can be understood, even though not forgiven. What is beyond comprehension, however, is the manufacture of an appellate opinion which is so written as to say that the district court committed no error at all. Any opinion can be written so as to read well enough to satisfy those unacquainted with the real story, which can only be found by resorting to the record and transcript.

Clearly there was trial court error in not instructing the jury on the doctrine of attractive nuisance, and clearly the plaintiff is entitled to a new trial whereat the jury should be so instructed.

## II.

In addition to *Bass v. Quinn–Robbins, supra,* there is a sequel in which another minor child drowned. That case is *Anneker v. Quinn–Robbins,* 80 Idaho 1, 323 P.2d 1073 (1958). The only difference in the two cases is that the drowning there was of a nine-year old and the 1958 drowning was of a three-year old. Both were at an excavated Quinn–Robbins gravel pit which had filled with water and were left unprotected. In both cases the district court ruled the defendant not liable as a matter of law for the dangerous conditions artificially created by the defendant. In the 1970 *Bass* case the Idaho Supreme Court relied on *Bicandi v. Boise Payette Lumber Co.,* 55 Idaho 543, 44 P.2d 1103 (1935). The *Anneker* case simply followed *Bass,* although Justice Porter was the only member of the Court sitting on both cases.

In *Bicandi* the Court's opinion was authored by Justice Morgan, joined only by Chief Justice Givens and District Judge Sutton. Justice Budge would have reversed the plaintiff's judgment on the basis that it had been "tried solely on the theory of attractive nuisance and not upon the negligence of the servant of the appellant [defendant lumber company]."

The majority ruled that there was a cause of action based on the negligence of defendant's watchman who had allowed the victim to play on the premises, but held no recovery could have been allowed under the attractive nuisance doctrine, the majority finding that the watchman had extended an invitation. Contrary to the view of Justice Budge the complaint, although sounding primarily in an attractive nuisance theory, alleged negligence which included:

(5) In maintaining or permitting well-beaten footpaths upon its mill site leading to and from the hole in the picket fence which it knew or in the exercise of reasonable care should have known was enticing and alluring to children of tender years.

(6) In permitting the pickets in the north end of the cast fence to become broken, worn and decayed so as to permit a space of sufficient size to permit easy access to said mill site.

(7) In failing to repair and maintain said east fence and particularly the north portion thereof so that the same would not constitute an enticing, alluring and attractive point for children of tender years to enter into and upon said mill ·site.

*Bicandi,* 55 Idaho at 548–49, 44 P.2d 1103 at 1107–08.

The majority opinion first noted the only then existing Idaho precedent, *York v. Pacific & Northern Ry. Co.,* 8 Idaho 574, 69 P. 1042 (1902), Idaho's turntable case. There the jury verdict was rendered in favor of the parents for the death of their four-year old son. On the railroad company's appeal it was not so brash as to contend that the four-year old youngster was in any way at fault, but rather sought to affix negligence upon the parents—this being in the dark days when any contributory negligence would have been a complete bar. The Court, not being sympathetic to that challenge, observed that there were no danger signs and no warning "keep off" signs, and that insufficient precautions had been taken to immobilize it from turning:

We do not think the evidence shows that appellant was blameless in the construction and maintenance of the turntable. On the other hand, we think it establishes that the appellant was careless and negligent in the construction, and especially the maintenance of the turntable, in that it did not have proper and sufficient appliances for fastening the turntable, and that it had no danger signs or anything to warn the people to keep off, and when we consider the public place on which it was constructed, and the fact that it was frequented by the people of that community, it was the duty of appellant to take every precaution to warn people of the danger of going upon or

riding thereon, even though it be a trespass to do so.

8 Idaho at 586, 69 P. 1042 at 1054.

Earlier in the opinion the Court discussed the four-year old's alleged status as a trespasser:

> The next contention is that deceased was a trespasser upon the property of appellant at the time of the injury complained of. It is not shown that there was any reason for anyone to think that it was a trespass to go upon this turntable any more than to walk upon the track of appellant. It is shown that there were no obstructions to anyone going upon the turntable, and that there were no signs of warning people of danger. It is also shown that people were in the habit of going upon the turntable and using it as a merry-go-round, and that it was an attractive place for children.

8 Idaho at 582, 69 P. at 1044.

Returning to *Bicandi*, after the citation to *York*, the Court noted that which was clear in *York*, and in many of the other early cases—but which seems to have become muddled over the years and again today in Justice Bakes' opinion—the basic theory for recovery is *actionable negligence*. The "attractive nuisance tag" is nothing but judicial recognition of what ordinary people call common sense: that the inquisitive and exploratory propensities of youngsters, untempered by the teachings of experience, do not give rise to sense of danger which older people are generally believed to have acquired. The Court in *Bicandi*, although not using the same language which is most befitting the attractive nuisance doctrine, *i.e. foreseeability*, stated the hypothesis of that doctrine very precisely in its first holding:

> After all, attractive nuisance cases, like other actions for damages for accidental injuries, are based on negligence—on the failure of the owner of property which is dangerous to others to exercise such care for their protection as a reasonably prudent person would employ under the circumstances. One possessing property which is dangerous to children of tender years and immature judg-

ment and which may, by reasonable care, be rendered less dangerous, or not dangerous at all, *is bound to exercise that care.*

55 Idaho at 550, 44 P.2d 1103 at 1109 (emphasis supplied). Although that Court, performing over 50 years ago under different social and economics conditions than those now prevailing, did not pursue to a proper conclusion its own grasp of the law, it did recognize the law when it went on to add to the foregoing excerpt:

> This doctrine cannot, in justice, be extended to require the owner of useful and necessary property, which is dangerous, to answer in damages to those who are injured by it if, by reasonable care, he could not have excluded them from contact with it, nor otherwise prevented their injury.

55 Idaho at 550, 44 P.2d at 1109. The Court theorized as follows in believing itself precluded from extending the doctrine of reasonable care:

> High explosives may be locked up beyond the reach of children, turntables and other dangerous machinery may be so secured that children cannot injure themselves thereby, *but this is not true of ponds, lakes, streams* and many other properties which are the subjects of private ownership and *which may cause the injury or death of children* who play about them. The doctrine of attractive nuisance should not be extended so as to hold liable the owner of such property when he has used it only as a reasonably prudent person would do under like circumstances for, by so using it, he is not guilty of actionable negligence.

55 Idaho at 550–51, 44 P.2d at 1109–10. The concluding sentence of the foregoing paragraph is worthy of repeating, "... *when he has used it as a reasonably prudent person would do under like circumstances.*" Anyone in this legal profession, no matter which side of the bench, should agree that the determination of what is "reasonable under the circumstances" is ordinarily a jury question. The court in *Bicandi*, undoubtedly in keeping with those times, explained its rationale in lan-

guage which would not command much, if any, support among today's Idaho people:

> Mill ponds are, and for many years have been, in common used in Idaho. Logs have been, and are, kept and floated therein, as is alleged to have been done by appellant, and it is not customary to enclose them. Appellant's failure to maintain a sufficient fence, or other barrier, to keep boys away from the pond does not render it liable.

55 Idaho at 551, 44 P.2d at 1110. Justification for failure to erect and maintain a fence, which justification is based on custom, is not a sufficient predicate for a holding that that failure created no liability.

What three members of the Court saw as "customary" falls short of a jury determination as to whether a reasonably prudent sawmill would or would not have taken precautions to prevent the disaster of a drowned child.

It can also be said that the *Bicandi* majority holding on the doctrine is greatly diminished by the Court's other holding that the *Bicandi* child was not a *trespasser*, but had become an invitee, and only a trespasser child may be given the benefit of the doctrine of attractive nuisance. Sensibly a court should recognize that a child is a child, and the technical classifications of licensee, permittee, invitee, and trespassee have little significance in determining questions of liability for the death or injury of children. What difference did it make in *Bicandi* or in *York* if the child who died was technically an invitee or a trespasser? And, as will be discussed shortly, what is it that truly makes a child into a trespasser?

Justice Holden, writing separately to approve the trial court verdict in *Bicandi*, made a complete shambles of the majority opinion. Astutely he pointed out that insofar as the doctrine of attractive nuisance was concerned there were two groups of courts, those espousing the "hard" doctrine, and those espousing the "humane" doctrine. In *Bicandi* he placed the majority there in the "hard" category. Were he here today he would be placing today's

majority in that same "hard" category—perhaps "super-hard."

That which Justice Holden wrote over 50 years ago is what hopefully might have been written in the instant case—or in any case where children are injured or killed by the maintenance of dangerous premises where any reasonable person would have obviated the danger—even though it might cost a few dollars to put in a gate and lock it, or put signs warning of the danger that railroad cars at rest may not be expected to remain at rest. Justice Holden was short and to the point:

> In the case at bar, then, one is compelled to determine whether to align himself with that group of courts which have adopted what has been designated as the 'humane' (attractive nuisance) doctrine, or with that other group which have adopted what has been designated as the 'hard' doctrine. The 'hard' doctrine puts *property* above *humanity;* on the other hand, the 'humane' doctrine puts *humanity* above *property*. To hold that one who artificially creates and maintains something dangerous on his land, which from its very nature is attractive to children, something which will attract children to it to play just as certainly as a fish is attracted to and mechanically follows a bait, is under no duty to exercise reasonable and ordinary care to protect children from its dangers because they are not given an express invitation, smacks of the barbarous it seems to me. I do not hesitate, personally, to adopt the rule which places *humanity* above *property*, and gives reasonable protection to children of tender years against dangers which they cannot perceive and appreciate, even though an express invitation may not have been given. [citations omitted.]

The complaint alleges, among other things, that appellant's log pond was attractive to children; that it allured and attracted children of tender years to it to play; that it was dangerous, and that appellant knew the pond was attractive to children, that it was alluring and attracting children of tender years to it to play, and that it was dangerous, all of

which stands admitted by the general demurrer of the appellant. So that, without expressing an opinion as to whether respondents' complaint states a cause of action, entitling respondents to recover upon the grounds and for the reasons stated in the majority opinion, I am fully convinced that it states a good cause of action against the appellant under the "attractive nuisance" doctrine. Therefore, while I do not concur in the majority opinion in so far as it refuses to apply the attractive nuisance doctrine to the case at bar, inasmuch as the complaint states a cause of action based upon that doctrine, I concur in the conclusion of the majority, that the respondents are entitled to recover and to that end that the judgment ought to be affirmed, and I base my concurrence on the rule announced in *Gould v. Hill*, 43 Ida. 93, 251 Pac. 167, to the effect that a plaintiff may recover if his complaint states *any* cause of action entitled him to relief, either at law or in equity. (emphasis in original.)

*Bicandi, supra*, at 556–57, 44 P.2d at 1115–16.

The first *Quinn–Robbins* drowning case, *Bass*, was probably a predictable sequel to the *Bicandi* majority's opinion. A new element interjected which was not present in *Bicandi*, but present in *Bass* was a raft on an artificially created pool. The defendant, according to the opinion, not only excavated the deep pit but "had cut a channel, constituting an inlet from the [Boise] river to the excavation, in such manner that the pit became filled with water." 70 Idaho at 310, 216 P.2d at 946. Even worse:

> [T]he excavated area, being unused, had grown up with weeds about the shores of the pit and along the inlet. The pond had a deceptive appearance of being shallow, was accessible without barrier by trails through the weeded area across an adjoining air field, and plainly visible.

70 Idaho at 310, 216 P.2d at 946.

Notwithstanding that it so portrayed circumstances both manmade and more dangerous even than those in *Bicandi*, the Idaho Supreme Court continued espousing the "hard" doctrine in the *Bass* decision. Justice Holden, who would resign from the bench three months after *Bass* was released, apparently had forgotten what he had written in *Bicandi*, and his name appears with the other justices concurring in the opinion for the Court.

Until it was cited in the instant attractive nuisance case, *Bass*, and *Anneker*, were unknown to me, for which I am grateful. Those opinions in my view were simply unthinking replays of the *Bicandi* majority, only worse on the facts. What I can make of that line of cases is not much. In *Anneker v. Quinn–Robbins*, 80 Idaho 1, 323 P.2d 1073, the Court said of the Quinn–Robbins pond that it was, as concluded in *Bass*, an artificial creation, but that "according to the great weight of authority," such could not support any theory of liability.

I remain impressed and persuaded by the opinion of Justice Holden in the *Bicandi* case. There is nothing in *Bass* or *Anneker* or the *Bicandi* majority opinions which shows any thought toward placing liability on owners or possessors of property which is dangerous and to which young children will be attracted.

It is a time for some realistic thought. To begin with, the words trespass and trespassers should be accorded their ordinary meaning where mundane affairs are concerned, and their criminal meaning when, and only when criminal affairs are at issue.

The word "trespass" basically means cross over, or pass over. At the common law there were various kinds of trespass, which provided civil remedies for destruction of or interference with property, real and personal. In Idaho the word has been legislatively defined, and to my understanding that occupies the field and takes the common law out of the picture. When the courts a long time ago spoke of children as being trespassers, the nomenclature was only correct insofar as they passed over another's property, with no criminal or wrongful connotation whatever.

As used in the instructions in the instant case, the word trespasser undoubtedly would have suggested that the plaintiff

child was in the act of doing something wrong. Nonetheless, there were two jurors who did not join the defense verdict. How this case would have come out otherwise, had the court instructed on the doctrine of attractive nuisance, will only become known if there is a second trial where the jury is instructed as to the defendant's duty of reasonable care under the circumstances, and is also instructed, as did take place here, that the plaintiff child has a similar duty commensurate with his age and capabilities.

### III.

In citing the *Huyck* case, 101 Idaho 299, 612 P.2d 142, for the proposition that, "We are cited to no rule of law which requires the owner or possessor of real signs to place signs thereon indicating its status as private property" (At p. 471, 757 P.2d at p. 1190), Justice Bakes appears to be facetiously playing games with the young plaintiff. While it is true that the plaintiff's attorney used that language in casting titles for his assignments of error, in the argument portion of his brief it is clear as can be that the attorney was not talking about signs merely declaring that the property was private, but that it should have been so posted to warn *Private Property— No Trespassing—Danger.* The exact language of the brief:

THE RAILROAD FAILED TO TAKE REASONABLE STEPS TO ELIMINATE THE DANGER OR OTHERWISE TO PROTECT THE CHILDREN.

The liability covered by this section is liability for negligence. The possessor of land is subject to liability to the trespassing child only if he has failed to conform to the standard of conduct of a reasonable man under like circumstances. Even though the possessor knows that children are likely to trespass, that the condition on the land involves an unreasonable risk of harm to them, and that they are likely not to discover or appreciate the risk, there is liability only if the possessor fails to take steps which a reasonable man would take under such circumstances. If the possessor has exercised all reasonable care to make the

condition safe, or otherwise to protect the children, and still has not succeeded, there is no liability. RESTATEMENT OF TORTS (SECOND), Comment O.

Under some circumstances a warning to children is all that can be expected of a reasonable man in the defendant's position.

There are some conditions, such as those of moving cars in a railroad yard, as to which no really effective precautions can be taken to make the condition itself safe, and the most that can be done as a practical matter is to warn trespassing children and so far as is reasonably possible to exclude them.

RESTATEMENT OF TORTS (SECOND), Comment E.

After entry by children into the railroad yard, there is likely little that the Railroad could have done to prevent injury to those children. As a practical matter, *they could have warned the trespassing children by installing no trespassing signs* and could have excluded them totally at the cost of $100.00 for a gate. In view of the likelihood of such trespass, the great risk of harm, and the foreseeability that such [children] trespassers would not realize the dangers, *a reasonably prudent person would have erected a gate and installed these no trespassing signs.*

Brief of Appellant, p. 30–32. Exactly what purpose that statement in the *Huyck* majority opinion served in that case was not known then or now. All that Justice Shepard wrote there was that the Court was not "cited" to any rule of law requiring an owner to erect signs, which was probably true, when one considers also that trespass in its generic sense simply means to cross over or pass over, as earlier mentioned.

In the instant case, however, the issue under discussion is the injury occasioned to a child trespasser, and contrary to what Justice Bakes would have the reader understand, there is law, solid Idaho case law, which has been on the books for over 80 years, in the *York* case which was earlier

discussed. There the Supreme Court specifically noted as to that railroad company:

> ... and that it had no danger signs or anything to warn the people to keep off ... and it was the duty of the appellant [railroad company] to take every precaution to warn people of the danger of going upon ... even though it be a trespass to do so.

*York*, 8 Idaho at 586, 69 P. at 1054.

In this case the trial court instructed the jury, "As a matter of law, the railroad is not required to place signs upon its property to indicate its status as private property." Anyone with even limited trial experience knows that such an instruction is bad. When it is couched in terms of "as a matter of law" a juror can readily believe that there is some statutory enactment to that effect—when there is none. A juror, if he is an attorney, and only such a juror, might understand that such is established case law precedent, but it is not. The worst aspect of the instruction is that it should not have been given. Jurors could and would confuse a "Private Property" sign with a "No Trespass" sign, or with a "Private Property—No Trespassing—Danger" sign. Most, if not all persons, have had some exposure to seeing such signs.

The first three sentences of Given Instruction No. 4 told the jurors of their obligation:

> These instructions define your duties as members of the jury and the law that applies to this case. Your duties are to determine the facts, to apply the law set forth in these instructions to those facts, and in this way to decide the case. In so doing, you must follow these instructions.

R., p. 117. Given Instruction No. 4 was requested by the defendant railroad company, and cited as authority the *Huyck* case plus "Title 62, Idaho Code, generally; Pocatello Municipal Code, generally." The instruction should not have been given. No case law is precedent for the giving of an instruction which could only serve to obfuscate the issue being tried, and confuse the jurors as has been discussed earlier. The trial court erred in succumbing to defend-

ant's request. The resultant effect on the jury can not be gauged, but it is inescapable that it was prejudicial to a jury who notwithstanding that error and the absolute failure of the court to instruct on the theory of attractive nuisance was extremely prejudicial to the plaintiff's case.

Just as recently as one year ago, Justice Bakes authored a unanimous opinion for this Court which held once again that:

> "Litigants have a right to have the jury instructed on every reasonable theory presenting a basis of a claim for relief, or defense thereto, which such theory finds support in the pleadings and evidence." Citing *Messmer v. Ker*, 96 Idaho 75, 524 P.2d 536 (1974), plus other cases, following which he concluded that a requested instruction should have been given.

*Garrett Freightlines v. Bannock Paving Co.*, 112 Idaho 722 at 731, 735 P.2d 1033 at 1041–1042 (1987). The trial bench and bar may well wonder why in his today's opinion Justice Bakes finds no error in the trial court's refusal to give an instruction on a theory which was presented by *both* parties litigant. This is not a directed verdict context. The trial judge *did* allow the jury to decide the case, but not with a full deck, and that is what the appeal is all about.