757 P.2d 218

**STATE of Idaho, ex rel., John V. EVANS, Governor; Pete Cenarrusa, Secretary of State; Jim Jones, Attorney General; Joe R. Williams, State Auditor; and Jerry L. Evans, Superintendent of Public Instruction, as the State Board of Land Commissioners; and Stanley F. Hamilton, Director, Department of Lands, Plaintiffs–Appellants,**

v.

**Albert E. BARNETT, and Virginia L. Barnett, husband and wife, Defendants-Respondents.**

No. 16739.

Court of Appeals of Idaho.

May 17, 1988.

Petition for Review Granted Sept. 7, 1988.

---

Jim Jones, Atty. Gen., Rinda Ray Just, Deputy Atty. Gen., Boise, for plaintiffs-appellants.

Robert E. Kinney, Orofino, for defendants-respondents.

SWANSTROM, Judge.

The State of Idaho brought this civil action alleging that Albert and Virginia Barnett were trespassing upon state land near the village of Weippe in Clearwater County. The dispute turns on the location of the section line forming the legal boundary between the land owned by the state in one section and the Barnetts' unsurveyed tract in another section. The Barnetts counterclaimed asking the court to hold that the section line followed the line of an old fence. The district court held for the Barnetts and the state appeals.

The determinative question is whether the district court erred as a matter of law in rejecting the state's proof that a section corner was a "lost" corner, as described by the state's surveyor, in favor of the Barnetts' proof that it was an "obliterated" corner. For reasons which follow, we reverse.

The Barnetts own a piece of land adjacent to and south of land owned by the state. When the Barnetts purchased their property in 1966 there was a fence which they believed marked their northern boundary. No survey was conducted then to determine if the fence was on the bound-

ary. The Barnetts improved the land with a driveway, an outbuilding, and a well, all located near the fence. At some later time the state became concerned that the fence might not be on the southern boundary of its land. To determine the true boundary location, the state hired Charles Cuddy, an independent surveyor with years of experience in the area. Cuddy conducted a survey and determined the true boundary of the state's land was several feet to the south of the fence. If the boundary line as determined by this survey is correct, some of the driveway and outbuilding, and all of the well installed by the Barnetts, are on state land.

The Barnetts and their neighbors requested that a different surveyor review the Cuddy survey to determine its accuracy. They employed James Burcham, an experienced surveyor from another part of the state to review the survey. The state agreed to this and even paid part of the expense. Burcham, who made no survey of his own, initially was concerned with the method used by Cuddy. After an investigation on the site, Burcham decided that Cuddy's survey was in error and that the fence did mark the correct southern boundary to the state's land. He reached this conclusion because Cuddy had treated a crucial section corner as "lost" whereas, in Burcham's opinion, it was "obliterated." These are terms of art familiar to surveyors. We discuss them later. Here, we simply note if the corner was a "lost" corner, then Cuddy correctly restored the corner by proportionate measurements and his survey supports the state's claim of trespass. If, on the other hand, the corner was "obliterated" but not "lost," the corner lies in the fence line as contended by the Barnetts. All attempts to resolve the dispute failed and this litigation followed, leading to a trial without a jury.

Following trial, the district court issued a short written opinion holding that the state had not met its "burden of proving that the fence line is not on the property line and that the monuments were lost and not obliterated." The court subsequently signed findings of fact, conclusions of law and a

judgment, all prepared by the Barnetts' counsel. This appeal followed.

The validity of surveys conducted to determine legal boundaries and the admission into evidence of the results of such surveys are governed by statute in Idaho. Idaho Code § 31–2709 provides:

Surveys must conform to United States manual.—No surveys or resurveys hereafter made shall be considered legal evidence in any court within the state, except such surveys as are made in accordance with the United States manual of surveying instructions, the circular on restoration of lost or obliterated corners and subdivisions of sections, issued by the general land office, or by the authority of the United States, the state of Idaho, or by mutual consent of the parties.

The parties are in agreement that the Bureau of Land Management, U.S. Department of Interior, *Manual of Instructions for the Survey of the Public Lands of the United States* (1973) (hereinafter BLM Manual) and a BLM circular entitled "Restoration of Lost or Obliterated Corners & Subdivisions of Sections, A Guide for Surveyors" (1974) are applicable to the Cuddy survey made in 1977. Both parties place differing reliance upon and interpretation of the following sections of the BLM Manual:

5–9. An obliterated corner is one at whose point there are no remaining traces of the monument or its accessories, but whose location has been perpetuated, or the point for which may be recovered beyond reasonable doubt by the acts and testimony of the interested landowners, competent surveyors, or other qualified local authorities, or witnesses, or by some acceptable record evidence.

A position that depends upon the use of collateral evidence can be accepted only as duly supported, generally through proper relation to known corners, and agreement with the field notes regarding distances to natural objects, stream crossings, line trees, and off-line tree blazes, etc., or unquestionable testimony.

. . . .

5–20. A lost corner is a point of a survey whose position cannot be determined, beyond reasonable doubt, either from traces of the original marks or from acceptable evidence or testimony that bears upon the original position, and whose location can be restored only by reference to one or more interdependent corners.

5–21. The rules for the restoration of lost corners should not be applied until all original and collateral evidence has been developed. When these means have been exhausted, the surveyor will turn to proportionate measurement, which harmonizes surveying practice with legal and equitable considerations. This plan of relocating a lost corner is always employed unless outweighed by conclusive evidence of the original survey.

These sections must be read together to determine whether, in the absence of the monument and its accessories placed by the original government surveyor, a later surveyor seeking to locate the corner should treat the corner as obliterated or lost.

First, we note that before some point can be accepted as the location of a corner once set and since obliterated, either the location must have been "perpetuated," or there must be some acceptable evidence establishing *beyond reasonable doubt* that the chosen spot is in fact the site of the original corner. BLM Manual § 5–9. It is clear that here the corner has not been "perpetuated." The process of perpetuating a corner is prescribed by statutes, designated as the Corner Perpetuation and Filing Act, I.C. §§ 55–1601 to 55–1612.

As the second paragraph in § 5–9 of the BLM Manual suggests, the chosen point will be acceptable only if supported by showing that it properly relates to the original surveyor's field notes, references to physical features and known corners, or unquestionable testimony. *See also Pointner v. Johnson*, 107 Idaho 1014, 695 P.2d 399 (1985).

Finally, any corner or point of a survey whose position cannot be determined, *beyond reasonable doubt*, "either from traces of the original marks or from acceptable evidence or testimony that bears upon the original position" is considered a "lost" corner. Its location can be restored only by reference to one or more interdependent corners, using a prescribed method of proportionate measurement. BLM Manual §§ 5–20, 5–21. Of course, the determination that a corner is "lost," and the use of proportionate measurement to restore it, should be reached only after "all original and collateral evidence has been developed" about the questioned corner. BLM Manual § 5–21.

We believe the foregoing statements about the meaning and application of the BLM Manual are consistent with decisions of the Idaho Supreme Court. In *Pointner v. Johnson, supra,* the Court was reviewing the evidence which had been offered at trial in support of an "obliterated" corner. The Court said:

> A corner position which depends upon the use of collateral evidence can be accepted only when duly supported and such support is generally achieved through proper relation to known corners, agreement with the field notes, or unquestionable testimony. MANUAL (1973), *supra* at 130.

107 Idaho at 1019, 695 P.2d at 404. Earlier Idaho cases have also recognized and applied the strict requirements of former editions of the BLM Manual. *See, e.g., Case v. Ericson,* 44 Idaho 686, 258 P. 536 (1927) and *Craven v. Lesh,* 22 Idaho 463, 126 P. 774 (1912).

The BLM Manual also controls surveys in the State of Washington. In *San Juan County v. Ayer,* 24 Wash.App. 852, 604 P.2d 1304 (1979), the court discussed the BLM Manual in relation to the burden of proof. It said:

> The directive of the Manual reflects experiences accumulated over the years by those who surveyed the continental United States and anticipated the problems of ascertaining obliterated corners. Their considered judgment that the establishment of an "obliterated corner" should require the highest degree of proof reflects an acknowledgement that error was bound to be made by surveyors subject to human frailties. Thus the GLO [General Land Office] prefers the reestablishment of a lost corner by the proportionate method rather than reliance upon evidence of its original location that is open to doubt. To lend certainty to an area that might otherwise lead to "great confusion and litigation," *Greer v. Squire,* [9 Wash. 359, 37 P. 545 (1894)], the Manual requires proof beyond a reasonable doubt of the original location of the point. [Footnote omitted.]

> We hold that a party seeking to recover the location of an obliterated surveying point must sustain the burden of proving the location of that point beyond a reasonable doubt.

604 P.2d at 1307–08.

What really is disputed here is a boundary line two miles long, running east and west between known or undisputed section corners on either end. The state owns all the land bordering the disputed line on the north. Several individuals, including the Barnetts, own parcels of land on the southern side of the disputed line illustrated below.

| 10 \| 11 | State | 11 | 12 | State | 12 \| 7 |
|---|---|---|---|---|---|
| | | | ? | | |
| 15 \| 14 | Barnett | 14 | 13 | | 13 \| 18 |

The location of the corner common to sections 11, 12, 13 and 14 is disputed. Its correct location determines the location of the disputed boundary.

For the state to prevail it must prove the correctness of the survey conducted by Cuddy. Here, the Barnetts challenge only the determination made by Cuddy that the questioned corner is "lost." Burcham, the Barnetts' expert in surveying, declares the corner is "obliterated."

Consequently, the state has the initial burden of coming forward with evidence showing the original survey point cannot be determined and its location can now be restored only by reference to adjacent corners. If this burden is met, the Barnetts, in order to sustain their contention that the corner is obliterated, must come forward

with evidence showing although there are no remaining traces of the original monument, either the location has been perpetuated or the point may be recovered beyond reasonable doubt by other acceptable evidence. The state has the overall burden of persuasion, requiring it to demonstrate that the weight of the evidence preponderates in its favor.

The determination of whether proffered evidence sufficiently supports the applicable burden of proof—whether it be a preponderance of the evidence, clear and convincing evidence or proof beyond a reasonable doubt—is primarily for the trial court. *Gem–Valley Ranches, Inc. v. Small*, 90 Idaho 354, 411 P.2d 943 (1966); *Kreiensieck v. Cook*, 108 Idaho 657, 701 P.2d 277 (Ct.App.1985). This assumes, of course, that the trial court was aware of the correct burden of proof. Under such circumstances, "a heightened burden of proof at trial does not alter the usual standard of appellate review." *Kreiensieck v. Cook*, 108 Idaho at 660, 701 P.2d at 280. "When a trial court finds facts ... [applying the correct burden] the question on appeal remains whether the findings are supported by substantial and competent evidence." *Id. Accord San Juan County v. Ayer, supra.*

Here we cannot say that the trial court had the correct burdens of proof in mind or that the court properly assigned those burdens. The district court apparently assigned the state the burdens of coming forward with evidence to prove the corner was lost and to prove that the place asserted by Burcham to be an obliterated corner was *not* an obliterated corner. This was error. Ordinarily, this error would require a remand to the trial court for reconsideration of its findings in light of instructions showing the correct burden of proof and its proper allocation. However, where a party with the burden to prove certain facts fails to prove those facts with substantial and competent evidence, we reverse. We would also reverse if it is clear from the record that the evidence adduced in support of certain facts does not meet the required burden of proof for establishing those facts. Having in mind where the burden lay and what the burden was, we will now examine the evidence in this case.

The original survey of the township in question was made in 1883 by a government-hired surveyor. The field notes of this surveyor show that he marked the corner in question with a scribed four-inch square post that was four feet long. The post was set two feet into the ground. Four trees, surrounding the point, were marked with blazes as bearing trees. In 1977, no evidence of the post or of the bearing trees remained. Both Cuddy and Burcham were in agreement on that. Moreover, Cuddy testified that he had looked for the corner while making a previous survey in 1965 or 1966 and he found no trace of the corner or its bearing trees at that time.

In 1977 Cuddy searched county records for any evidence that some surveyor between the time of the original GLO 1883 survey and 1977 had located the corner. He found nothing of record about any prior survey. Burcham's search for such evidence was likewise unsuccessful.

In addition, Cuddy looked at records of Potlatch Forest Industries (PFI), a large timber company whose timber cruisers had been active in the area for many years. He talked to at least two of those timber cruisers. Neither of them claimed to have found the corner. Although the state owned and managed hundreds of acres of timberland in the area, the Department of Lands had no information concerning the questioned corner.

Cuddy retraced the measurements and courses on the ground to the point indicated by the notes of the original surveyor, but found no traces of the original monument. Over 100 feet to the north and to the west of the place Cuddy determined the corner should be, are the objects that Burcham contends mark the original location of an "obliterated" corner. Cuddy considered this evidence, but because he was not convinced beyond a reasonable doubt that the evidence marked an obliterated corner, Cuddy rejected it. Having done so, he followed the BLM Manual's directions and

restored the corner by proportional measurements from other established corners. It is undisputed that if the corner was indeed "lost" he correctly restored it.

To support his "obliterated" corner theory, Burcham placed considerable reliance upon the fence because of its age. He theorized that when the fence was built, in the late 1930's, it was likely that the bearing trees memorializing the section corner were still existent and would have been used by the fence builder to guide the location of the fence. Additionally, some old tree blazes were found in line with the fence.

Cuddy did not place great reliance upon the fence because it was unknown by whom or under what circumstances the fence had been built. Cuddy had found other fences in the area to be considerably off boundary lines. When he made his survey, Cuddy bored into the tree blazes he found along the fence. These borings showed that the blazes were made about the same time the fence was built. Cuddy testified he believed these blazes were left by a timber cruiser named Francis Storm. Cuddy was unable to learn who had built the fence. Moreover, he found other old blazes, besides those made by Storm, in close vicinity to the position where Cuddy established the "lost" corner.

When he inspected the fence line in the vicinity of the missing corner, Burcham observed a squared post that was scribed with the four numbers: 11, 12, 13 and 14, one number to a side. On a nearby tree was a metal tag indicating that this was the "approximate" location of the section corner. Burcham testified that the fence at this location had a very slight angle to it, indicating an awareness on the part of the builder that the corner once existed there. Burcham was convinced that the person or persons who set the post and the tag had once found reliable evidence of the original corner.

Cuddy testified that the post and tag had been placed there in 1951 by a timber cruiser named Frank Randall. Cuddy testified he believed Randall had been conducting timber cruises on land to the north of the fence. Cuddy believed, from blazes and other evidence, that Randall had been running a line southward—in order to mark the east and west boundaries of certain private timberland; that when Randall came to the fence line he quit there, believing he had completed the line. Cuddy surmised that Randall, who was not a surveyor, simply had accepted the fence line as the approximate location of the section line, placing the squared post and metal tag to mark the "approximate" location. Cuddy stated that Randall and other timber cruisers in the area often placed metal tags where the lines they were running intersected roads or fences. He stated, from his experience, that if Randall did not find the actual corner or an original bearing tree, he would inscribe the metal tag as the "approximate" location, whereas if Randall had found original evidence of the corner, he would have so indicated on the tag.

According to Cuddy, some blazes supported his position. He testified that he found blazes, about forty-five years old, on a north-south line near the location where he placed the corner. Moreover, Cuddy testified he actually retraced the original survey, following the GLO field notes. This exploratory procedure, recommended by the BLM Manual, placed the corner closer to the spot determined by Cuddy than to the place where Burcham contended the corner was.

Finally, Burcham relied upon certain United States Geological Survey (USGS) maps of the area. A USGS mapping team was in the area in 1966. A topographic map dated 1966 was later published showing the gridwork of section lines. Typically, where the lines intersect a small red cross will be shown if the mapping team finds evidence on the ground of a corner. The map introduced by the state showed the corner common to sections 11, 12, 13 and 14 as found.

Over the objections of the state, the Barnetts also introduced into evidence unauthenticated copies of part of a preliminary USGS map. Burcham testified he obtained these copies from the California office of USGS. They contained certain hand writ-

ten notations at the various section corners purporting to show by reference to a "section corner data code" what physical evidence, if any, the mapping team found at each section corner. These exhibits were offered and admitted during the cross-examination of Cuddy. The court stated that the exhibits would be admitted "for the very limited purpose ... of cross-examination of this witness as to what his understanding and so on were, but not as to the validity of the instrument or anything of that nature." Later, again over objections by the state, Burcham was permitted to testify about the physical evidence "found" by the USGS mapping team, as indicated by the handwritten symbols. This included a bearing tree and a monument. Burcham assumed the monument referred to was the wooden post with the section corners scribed on it that the timber cruiser, Randall, had placed. Cuddy agreed with this assumption. Moreover, Cuddy contended the mapping team's reference to a bearing tree indicated that someone had mistakenly assumed the tree with Randall's metal plate attached was a bearing tree. Accordingly, Cuddy gave the USGS map symbols no greater weight than he gave to the physical objects themselves.

Burcham testified that in his experience he was able to find about seventy-five percent of the corners which the USGS had marked as found on its maps. Cuddy believed such markings to be less reliable. Cuddy testified to several instances where the USGS had missed known corners and had marked corners as found which were never found by any surveyor.

As we have emphasized, a party seeking to recover the location of an "obliterated" corner must sustain the burden of proving the location of that point beyond a reasonable doubt. Absent such convincing proof, the corner should be considered as "lost." The BLM Manual then prescribes the exact way a "lost" corner shall be restored. Burcham's testimony, however, reveals a somewhat different awareness of these strict requirements. He stated:

And so I took the position that I examined the preponderance of evidence for accepting the old corner as far as the

fence and evidence from other surveyors, including these timber cruisers, and then I examined what evidence I had to disprove the corner.

And frankly, the weight of evidence led me to form my opinion for accepting the old corner rather than establishing a corner by double proportion, because we know that a corner proportioned in will not fall in in exactly the same place as the original corner was.

Many surveys that have retried proportionate measurement, it's only used as a last resort to reestablish that corner if no other collateral evidence can be found.

But I choose to use whatever evidence that I find, and if it's reasonable to accept it, I'd rather accept it and not upset the community by causing changes in lines. And I think that's the situation that we fall in in the present problem.

When finally asked if he had formed an opinion as to whether "that was a lost or obliterated corner," Burcham replied:

As far as I'm concerned, it's an obliterated corner. It's not lost because the preponderance of evidence, in my estimation, was there to cause me to make that decision.

From the record we hold it is clear that neither expert believed "beyond a reasonable doubt" that the place marked by a timber cruiser in or near the fence was in fact an obliterated corner. Because the proof showing an obliterated corner was inconclusive, Cuddy was correct in following the strict requirements of the BLM Manual by restoring the lost corner through proportional measurements derived from the original surveyor's field notes. We conclude as a matter of law that the state met its burden of proof. We further conclude as a matter of law that the evidence adduced by the Barnetts is insufficient to meet their burden of proof. Accordingly, we hold that the judgment entered by the district court must be reversed. Having reached this decision we deem it unnecessary to address whether the court erred in allowing the unauthenticated map sheets and notations to be used

**362**

as proof of the recitals contained therein. The case will be remanded to the district court for entry of a judgment consistent with this opinion.

Costs to appellants. No attorney fees awarded.

WALTERS, C.J., concurs.

BURNETT, J., sat but subsequently deemed himself disqualified and did not participate in the final decision.