766 P.2d 736

**Dustin JACOBSEN, a minor child; and Judy L. Hamlin, a single woman, Plaintiffs–Appellants,**

v.

**The CITY OF RATHDRUM, Defendant–Respondent.**

**No. 16901.**

Supreme Court of Idaho.

Sept. 12, 1988.

Sims, Liesche & Newell, P.A., Coeur d'
Alene, for plaintiffs-appellants. W. Corey
Cartwright argued.

Hull, Hull & Branstetter, Wallace, for
defendant-respondent. Michael K. Branstetter argued.

JOHNSON, Justice.

This is a personal injury case. The primary issue is whether I.C. § 36–1604, Idaho's recreational use statute (the recreational use statute), precludes a claim on behalf of a two-year old child, who suffered irreparable and irreversible brain damage as the result of nearly drowning in a ditch that runs through the city park in Rathdrum (the city). The child's mother asserted claims on behalf of the child premised on the doctrine of attractive nuisance and on the wilful and wanton maintenance by the city of a dangerous condition in the park. We reverse the summary judgment granted by the trial court dismissing the complaint and hold that a owner may be liable for wilful or wanton conduct that causes injury to a person using the owner's land for recreational purposes. We conclude that there are genuine issues of material fact regarding the city's maintenance of a dangerous condition in the park that made it inappropriate to grant summary judgment as to the wilful and wanton conduct of the city. We affirm the trial court's granting of summary judgment on the issue of attractive nuisance, since we conclude that the facts presented in opposition to the motion do not support the application of the doctrine. We also hold that no showing of specific intent to use property for recreational uses is necessary for the application of the recreational use statute.

## I.

### THE FACTS.

The child lived with his mother and his siblings across the road from the park maintained by the city. There is a ditch in the park that is dry for most of the year but which swells with rapidly running water in the spring. Near the ditch are swings, slides and other playground equipment. The playground equipment is located near a bridge across the ditch. The bridge has a single horizontal rail located

approximately three feet above the floor of the bridge.

On April 12, 1985 the child together with his mother, his siblings and some friends spent the better part of the day in the park. The child and his family returned home at approximately 3:00 p.m. The mother told the child to stay in the front yard and play with his sisters. Sometime later the mother found that the child was no longer in the yard and went to the park to find him. There she met one of the child's playmates as he was coming off the bridge. The playmate told her that the child had fallen into the ditch. A cigarette lighter with which the child often played was lying on the bridge. After being unable to find the child, she summoned neighbors to help search for him. The child was found about fifteen minutes later about one-half mile downstream. Although the child was revived, his near drowning resulted in severe anoxic encephalopathy with severe mental retardation, cerebral palsy and a seizure disorder.

The mother filed a timely tort claim notice with the city on behalf of the child claiming damages due to the injuries received from the near drowning. Subsequently, the mother filed this action on behalf of the child. The city filed a motion for summary judgment on the ground that the city is immune from liability by reason of the recreational use statute. In support of the motion the city relied on the pleadings on file and on an affidavit of the city clerk, in which the clerk asserted that the city had never received any complaints regarding the ditch, the bridge or the play equipment located in the park, that except for this action, the clerk was unaware of any accidents or deaths occurring in the park and that the city had no records of any accidents or deaths occurring in the park. The affidavit also attached three photographs showing the ditch and the playground equipment in the park.

In opposition to the motion the mother submitted affidavits of herself, the doctor who cared for the child following the near drowning, a psychologist, and the director of parks and recreation for Spokane Coun-ty, Washington. The mother's affidavit set forth the facts concerning the child, the park, the swollen condition of the ditch, and the events leading up to the near drowning of the child. The affidavit of the doctor reported the child's medical condition following the near drowning. The affidavit of the psychologist recited his understanding of the events leading up to the near drowning of the child and contained the following statements:

A child of this age would not have formed an "intent" to go anywhere for "recreational" purposes.

. . . .

A child of this age is not in a position to appreciate or comprehend any danger which may be associated with the bridge. . . .

The affidavit of the Spokane County director of parks and recreation stated that he had examined photographs of the park, the placement of the playground equipment, the ditch and the bridge. His affidavit contained the following opinions:

In my opinion, the footbridge located in close proximity to the playground equipment is extremely dangerous to children and adults as well. . . . The footbridge is particularly dangerous to children six years of age or less who can either fall underneath the handrail into the ditch or swing from the handrail into the ditch.

It is also my opinion that the playground equipment is located too close to the irrigation ditch and the foot bridge. By placing the toys in the park, the City should reasonably expect that children will be attracted to the area. Locating the playground equipment so close to the irrigation ditch and bridge creates an unreasonable danger to children who would also be attracted to the water and bridge.

It is my opinion that the irrigation ditch located in the Rathdrum City Park is in a high use activity area and should be fenced or personnel should be assigned to supervise the area near the ditch.

In summary, I feel that the city of Rathdrum acted irresponsibly in creating a dangerous condition for children by

placing playground equipment in close proximity to a hazardous foot bridge and near an unfenced, unsupervised irrigation ditch.

The trial court ruled that the recreational use statute applied to the child's near drowning, that there were no genuine issues of material fact, and that the recreational use statute precluded claims based on wilful or wanton conduct or an attractive nuisance. The trial court also concluded that the child was in the park for recreational purposes and that the question of his specific intent in being there was not an issue. The court granted summary judgment in favor of the city and dismissed the complaint. The mother has appealed from this order of the trial court.

## II.

## THE RECREATIONAL USE STATUTE DOES NOT PRECLUDE LIABILITY FOR WILFUL AND WANTON CONDUCT.

■ The portions of the Idaho recreational use statute that are pertinent to this case are as follows:

**36–1604. Limitation of liability of landowner.**—(a) Statement of Purpose. The purpose of this section is to encourage owners of land to make land and water areas available to the public without charge for recreational purposes by limiting their liability toward persons entering thereon for such purposes.

(b) Definitions. As used in this section:

1. "Land" means private or public land, roads, trails, water, watercourses, private or public ways and buildings, structures, and machinery or equipment when attached to or used on the realty.

2. "Owner" means the possessor of a fee interest, a tenant, lessee, occupant or person in control of the premises.

3. "Recreational Purposes" includes, but is not limited to, any of the following or any combination thereof: Hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, animal riding, motor-cycling, snowmobiling, recreational vehicles, winter sports, and viewing or enjoying historical, archeological, scenic, or scientific sites, when done without charge of the owner.

(c) Owner Exempt from Warning. An owner of land owes no duty of care to keep the premises safe for entry by others for recreational purposes, or to give any warning of a dangerous condition, use, structure, or activity on such premises to persons entering for such purposes.

(d) Owner Assumes No Liability. An owner of land or equipment who either directly or indirectly invites or permits without charge any person to use such property for recreational purposes does not thereby:

1. Extend any assurance that the premises are safe for any purpose.

2. Confer upon such person the legal status of an invitee or licensee to whom a duty of care it owed.

3. Assume responsibility for or incur liability for any injury to person or property caused by an act of omission of such persons.

I.C. § 36–1604(a)–(d) (1977).

This Court has previously declined to take a position as to whether this statute "would absolve a landowner of liability for willful or wanton injury to a trespasser." *Johnson v. Sunshine Mining Co., Inc.,* 106 Idaho 866, 871, 684 P.2d 268, 273 (1984), and *Corey v. State,* 108 Idaho 921, 923, 703 P.2d 685, 687 (1985). We now hold that the recreational use statute does not preclude liability of an owner for wilful or wanton conduct that causes the injury of a person using the owner's land for recreational purposes. We find this is an appropriate case in which to reach this decision, because we conclude that the child was using the park for recreational purposes and because there are genuine issues of material fact as to whether the city was wilful and wanton in maintaining a dangerous condition in the park that resulted in the near drowning of the child and the child's brain damage.

■ A reading of the pertinent portions of the recreational use statute causes

us to conclude that the statute was intended to insulate landowners only from liability predicated on a duty of care owed to an invitee or licensee. The statute states:

> An owner of land ... who either directly or indirectly invites or permits without charge any person to use such property for recreational purposes does not thereby:
>
> . . . .
>
> 2. Confer upon such person the legal status of an *invitee or licensee* to whom a duty of care is owned.

I.C. § 36–1604(d)(2) (Emphasis added).

It is clear to us that the intention of the legislature was that for liability purposes those who use property for recreational purposes under the statute will be treated the same as if they had been trespassers. Otherwise, the statute would create the anomalous situation that a landowner who directly or indirectly invites or permits without charge a person to use their land for recreational purposes would be immune from the liability to which any landowner is exposed as to trespassers. There is no indication in the statute that the legislature intended to abolish a landowner's liability to trespassers. Those who use an owner's land for recreational purposes are entitled to at least the same protection as trespassers are afforded.

The statute itself gives some indication of the correctness of this interpretation in its title ("Limitation of liability of landowner.") and in the reference to "limiting their liability." I.C. § 36–1604(a). If the legislature had intended to abolish all liability or to make landowners immune from liability under any circumstances, the statute could easily have been worded to accomplish that purpose. Reason and the provisions of the statute itself cause us to conclude that the legislature intended that landowners would continue to be liable to recreational users of their land as though the users were trespassers. This is the *only* interpretation of the statute that allows us to read the statute as a whole and to make sense of each of its parts.

## III.

## THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER THE CONDUCT OF THE CITY WAS WILFUL AND WANTON.

Having concluded that recreational users should be treated as trespassers for the purpose of determining the liability of the owner of the land they use, we now turn to determining whether there were genuine issues of material fact in this case that made it inappropriate to grant summary judgment on the issue of the city's liability for wilful and wanton conduct.

The duty of a landowner to a trespasser is "to refrain from wilful or wanton acts which might cause injuries." *Huyck v. Hecla Mining Co.*, 101 Idaho 299, 301, 612 P.2d 142, 144 (1980). Here, the wilful and wanton maintenance by the city of a dangerous condition in the park has been alleged. "Willful and wanton misconduct" is defined by the Idaho Jury Instructions as follows:

### WILLFUL AND WANTON MISCONDUCT

Willful and wanton misconduct is present if the defendant intentionally does or fails to do an act, knowing or having a reason to know facts which would lead a reasonable man to realize that his conduct not only creates unreasonable risk of harm to another, but involves a high degree of probability that such harm would result.

IDJI 225 (1985).

In *Ellis v. Ashton & St. Anthony Power Co.*, 41 Idaho 106, 120, 238 P. 517, 522 (1925) this Court held that the evidence showed what the Court referred to as "wanton negligence." There a nine-year-old girl was instantly killed by coming in contact with a high tension transmission line that had been constructed on the bank of a canal that was private property. The wire with which the child came in contact was only five feet four inches from the ground. There were no warnings, barriers, fences or other obstructions to protect the public from the line. There were piles of

loose dirt on the canal bank that were "above the level of the surrounding country and would necessarily be somewhat prominent and afforded a view for quite a distance." *Id.* at 112, 238 P. at 519. The power company "knew the dangerous construction of the secondary line and the condition of the country, and in general, the adjacent population, the number of school children and that the road ... upon which the children traveled to school, extended immediately by the spoil bank upon which the line was constructed." *Id.* The deceased girl trespassed on the canal bank and was electrocuted by the sagging power line. The jury awarded the parents of the deceased girl $10,000 for her death. In affirming the judgment this Court approved an instruction that "stated that if the defendants maintained a dangerous agency and knew that children or others were accustomed to frequent or go on the ground, then if the dangerous appliance were unprotected, and if by reason of defendants' negligence injury resulted, the defendants would be liable." 41 Idaho at 120, 238 P. at 522. The Court concluded that "this instruction was evidentially framed for the purpose of further indicating to the jury what conditions should necessarily obtain before the defendants would be guilty of wanton negligence." *Id.*

From *Ellis* and IDJI 225 we can formulate the rule that should be applied in this case in determining whether there are any genuine issues of material fact that made the granting of summary judgment inappropriate. The record before the trial court on the motion for summary judgment must be examined to determine if there are genuine issues of fact as to whether the city maintained a dangerous condition in the park knowing or having reason to know that children were accustomed to frequent the park and that allowing the condition to remain would not only create unreasonable risk of harm to children, but would also involve a high degree of probability that the harm would result.

In reviewing the affidavits submitted in support of and in opposition to the motion for summary judgment we must liberally construe the facts in favor of the child and resolve all doubts against the city. The motion should be denied if conflicting inferences could have been drawn from the facts alleged in the affidavits, and if reasonable people might have reached different conclusions as to whether the city was wilful and wanton. *Anderson v. City of Pocatello*, 112 Idaho 176, 179–80, 731 P.2d 171, 174–75 (1987).

While the affidavit of the city clerk asserts that the city had not received any complaints regarding the ditch, the bridge, or the playground equipment and that the clerk was unaware and had no records of any accidents or deaths occurring in the park, the affidavits in opposition to the motion assert the following facts, which were not challenged by the city:

1. The playground equipment was located near the ditch.

2. The ditch had swollen with rapidly running water that was deep enough to be up to the mother's chest when she jumped into the ditch to try to find the child.

3. The bridge across the ditch near the playground equipment had only a single horizontal rail approximately three feet above the floor of the bridge.

4. A playmate said that the child had fallen into the ditch.

5. A cigarette lighter with which the child often played was lying on the bridge when the mother arrived in the park to look for the child.

6. In the opinion of the Spokane County director of parks and recreation, an expert on playground design, the bridge located in close proximity to the playground equipment was "extremely dangerous to children," and was "particularly dangerous to children six years of age or less who can either fall underneath the handrail into the ditch or swing from the handrail into the ditch." This expert stated that "[l]ocating the playground equipment so close to the irrigation ditch and bridge creates an

unreasonable danger to children who would also be attracted to the water and bridge."

Considering these facts and the reasonable inferences from them that can be drawn in favor of the child, and resolving all doubts against the city, reasonable minds might reach different conclusions as to whether the city was guilty of wilful and wanton conduct in not protecting children who came to the park from the dangerous condition in the park created by the ditch and the bridge. It is reasonable to infer that the city knew of the dangerous condition that existed in the park in the springtime when the ditch was swollen with rapidly running water, that the City knew of the condition of the bridge, and that allowing the ditch and the bridge to remain in that condition in the spring would create unreasonable risk of harm to children and would involve a high degree of probability that harm would result. As Justice Huntley said in his dissent in *Johnson:*

> The most critical element of wantonness is knowledge, and that element need not be shown by direct evidence; rather, it may be made to appear by showing circumstances from which the fact of knowledge is a legitimate inference. 106 Idaho at 873–74, 684 P.2d at 275.

Therefore, the trial court should not have granted summary judgment, and we reverse the trial court's order and remand for further proceedings.

IV.

THE RECREATIONAL USE STATUTE DOES NOT PRECLUDE LIABILITY UNDER THE DOCTRINE OF ATTRACTIVE NUISANCE, BUT THERE IS NOT SUFFICIENT EVIDENCE TO SUSTAIN AN ATTRACTIVE NUISANCE CLAIM.

■ The doctrine of attractive nuisance applies to a child who trespasses and who is injured by a dangerous condition or structure, if the child was attracted by the dangerous structure or condition maintained or permitted on the property, if the structure or condition was peculiarly or unusually attractive to children, if the danger was not apparent to immature minds, and if the owner knew of the structure or condition, or if the facts were such as to charge the owner with knowledge of the structure or condition. *Bass v. Quinn–Robbins, Co.,* 70 Idaho 308, 312, 216 P.2d 944, 948 (1950).

■ Since a claim based on the doctrine of attractive nuisance begins with the fact that the child who was injured was a trespasser, the recreational use statute does not preclude the liability of a landowner under this doctrine. Even though a child who uses land for recreational purposes under the statute is not a trespasser, the owner should be liable for injury to the child, if the owner would have been liable to a trespassing child.

■ The doctrine of attractive nuisance in this state does not apply to streams. *Id.* at 313–14, 216 P.2d at 945; and *Bicandi v. Boise Payette Lumber Co.,* 55 Idaho 543, 550–51, 44 P.2d 1103, 1105–06 (1935). It may apply to a structure like the bridge in this case, if the elements of the doctrine are present. The affidavit of the Spokane County director of parks and recreation establishes that there were genuine issues of fact as to the dangerousness of the bridge at the time of the near drowning. The reasonable inferences from this affidavit and that of the mother are that the city knew or should have known of the dangerousness of the bridge during high water, and that children were likely to come to the park and be injured because of this condition. The presence on the bridge of the cigarette lighter with which the child often played leads to the reasonable inference that the child had been on the bridge shortly before the near drowning. However, the affidavits do not raise genuine issues of material fact as to whether the child was attracted to the park by the bridge. What evidence there is seems to indicate that the child came to the park because he had been there earlier in the day with his family and friends, and because other children were there. Therefore, there are not sufficient evidence or inferences here to prevent summary judg-

ment on the claim based on the doctrine of attractive nuisance, and we affirm that portion of the trial court's decision.

## V.

## SPECIFIC INTENT FOR RECREATIONAL USE IS NOT NECESSARY UNDER THE RECREATIONAL USE STATUTE.

 The mother contends that the recreational use statute requires an intent to use land for recreational purposes and raises the question whether the child could have formed the required intent. The affidavit of the psychologist creates a genuine issue as to whether the child could have formulated a specific intent to use the park for recreational purposes. However, the recreational use statute requires only that the recreational user use the owner's property for recreational purposes. Nothing in the statute requires that the recreational user formulate a specific intent to use the property for recreational purposes. If the person actually uses the property for recreational purposes, no showing of a specific intent to do so is required. Here the mother acknowledges in her affidavit that the child frequently played in the park, that she met one of the child's playmates in the park on the day of the near drowning when she went to look for the child, and that the playmate said the child had fallen in the ditch and drowned. The only reasonable inference that can be drawn is that the child was in the park playing before the near drowning. Although playing is not one of the "recreational purposes" listed in I.C. § 36–1604(b)(3), the list of activities there does not limit the term. We conclude that playing is within the recreational purposes contemplated by the statute. Therefore, we affirm the decision of the district court on this issue.

## VI.

## CONCLUSION.

The summary judgment of the trial court is reversed as to the claim that the child was injured because of the wilful and wanton conduct of the city and the case is remanded for further proceedings consistent with this opinion.

Costs to appellants.

No attorney fees on appeal.

BAKES, BISTLINE and HUNTLEY, JJ., concur.

BAKES, Justice, concurring specially:

The Court's opinion, which I join, correctly points out that at the summary judgment stage, "The motion should be denied if conflicting inferences could have been drawn from the facts alleged in the affidavits, and if reasonable people might have reached different conclusions as to whether the city was willful and wanton." That determination requires an evaluation of the evidence in the record, based upon the law applicable to the city's conduct, i.e., the city's alleged willful and wanton misconduct. As expressed in IDJI No. 225, willful and wanton misconduct is defined as:

"Willful and wanton misconduct is present if the defendant intentionally does or fails to do an act, knowing or having a reason to know facts which would lead a reasonable man to realize that his conduct not only creates unreasonable risk of harm to another, but involves a high degree of probability that such harm would result." IDJI 225 (1985).

The plaintiff's burden of proof in this case, i.e., proof that the city's actions constituted "willful and wanton misconduct," IDJI 225, is greater than proving mere ordinary negligence and, accordingly, the factual record must be evaluated based on that higher standard. E.g., Russ Ballard v. Lava Hot Springs Resort, Inc., 97 Idaho 572, 548 P.2d 72 (1976) (evidence held insufficient where applicable law required proof to be clear and convincing); State of Idaho ex rel. Evans v. Barnett, 114 Idaho 355, 757 P.2d 218 (Ct.App.1988) (evidence held insufficient in a surveying case where applicable law required proof beyond a reasonable doubt). On the record in the present case, it is a very close call as to whether or not the plaintiff's affidavits alleged sufficient misconduct on the part of

the city to raise a triable issue of fact of whether or not the city's conduct was "willful and wanton" within the meaning of the law as outlined in the Court's opinion today. The Court's opinion, *ante* at 271–272, 766 P.2d at 741–742, describes the multiple acts of misconduct which arguably constitute such willful and wanton misconduct, and concludes that "reasonable minds might reach different conclusions as to whether the city was guilty of wilful and wanton conduct...." On this summary judgment record, I agree with that conclusion.

That is not to say, however, that depending upon how the witnesses ultimately testify at trial, the trial court might not conclude, upon a motion for a directed verdict or a motion j.n.o.v., that the evidence presented at trial was not sufficient to justify the factual conclusion that the city's conduct was "willful and wanton." Summary judgment is only one of the stages of a lawsuit in which a trial court is required to evaluate the evidence in a case, based upon the law applicable to that case, to determine whether or not a claim (or a defense) has been supported by sufficient evidence to justify the submission of that claim to a trier of fact. Chronologically, the motion for summary judgment is the first occasion the trial court has to determine whether there is sufficient evidence to support such a claim or a defense. Later, when the plaintiff has completed his case in chief at trial, the trial court may again be called upon to evaluate the sufficiency of the evidence when ruling upon a motion for directed verdict. I.R.C.P. 50(a). Again, after all of the evidence is in, and a motion for directed verdict is made, the trial court must again evaluate the sufficiency of the evidence, based upon the law applicable to the case, to determine if there is sufficient evidence to support the claim. I.R.C.P. 50(a). Then, after the jury has rendered its verdict, the trial court may again be called upon to evaluate the sufficiency of the evidence, based upon the law applicable to the case, in ruling upon a motion for judgment notwithstanding the verdict. I.R.C.P. 50(b). *See Harvey v. F–B Truck Line, Inc.,* 115 Idaho 411, 767 P.2d 254 (1988). Finally, on appeal, appellate courts may again be called upon to review the evidence to determine whether there was sufficient evidence, based upon the law applicable to that case, to support the decision of the finder of fact. *Harvey v. F–B Truck Line, Inc., supra; Russ Ballard v. Lava Hot Springs Resort, Inc.,* 97 Idaho 572, 548 P.2d 72 (1976) (evidence held insufficient where applicable law required proof to be clear and convincing); *State of Idaho ex rel. Evans v. Barnett,* 114 Idaho 355, 757 P.2d 218 (Ct.App.1988) (evidence held insufficient in a surveying case where applicable law required proof beyond a reasonable doubt).

The motion for summary judgment, which is the first stage in the lawsuit at which the trial court must evaluate the evidence, often comes at a very early stage in the proceedings, usually based primarily upon affidavits, rather than testimony taken at trial which is subject to cross examination and impeachment. Our cases have recognized that in summary judgment proceedings based upon affidavits, the evidentiary basis for the claim (or defense) may not have been developed as thoroughly as it would have been if there were extensive depositions, or a trial with examination and cross examination of the witnesses. Accordingly, we have generally been cautious in granting summary judgment, particularly where the evidentiary record is based solely on affidavits. If, after giving the non-moving party the benefit of all conflicting inferences, a reasonable doubt exists as to whether or not the plaintiff's evidence supports his claim, summary judgment should be denied.

I agree with the Court's opinion that the motion should not have been granted in this case on the status of this record.

SHEPARD, Chief Justice, dissenting.

In my view the majority opinion in this case seizes upon the facts of a tragic accident to impose a liability upon a municipality, which has been hitherto unknown. The facts are simple and straightforward. The defendant/municipality maintained a park for recreational use. Through the park ran

a water course which is dry during the majority of the year. Presumably the water course is man-made, and there is no indication here that the municipality in any way controlled the flow of water. There is no evidence, or even assertion, that the water course constituted in any way a hidden or concealed danger. Although water flowed during only part of the year, the municipality maintained a bridge over the water course which included a handrail thereon.

There is no indication in the record of any but the following facts. The two-year-old child was permitted to wander unattended from his home across the street from the park. The child, with its family, had been in the park earlier the same day. The child was found floating in the water course. There is nothing but speculation to indicate how the child came to be in the water course.

There is no question in my mind that this action falls within the purview of the Idaho recreational use statute, I.C. sec. 36–1604 *et seq.* The majority acknowledges the existence and purpose of the statute, *i.e.*, to encourage owners of land to make land and water areas available to the public without charge for recreational purposes by limiting their liability toward persons entering thereon for such purposes. To assert that the two-year-old child in question entered upon the premises for any other purpose than recreation is in my view totally unfounded. This Court most recently, in *McGhee v. City of Glenns Ferry*, 111 Idaho 921, 729 P.2d 396 (1986), clearly held that the operation of a city park falls within the scope of "recreational purposes" as contemplated in I.C. sec. 36–1604.

In my view the majority seriously errs when it asserts that the statute is inapplicable in the case at bar because there has been alleged the "willful and wanton conduct" of the municipality. I find nothing in the record to support that assertion of the majority. There is no assertion, nor any basis in the record, to indicate that the defendant/municipality willfully caused the injury to the child. The majority postulates that the child was playing on the bridge and fell into the water. There is no

support in the record therefor. Even assuming the course of events postulated by the majority, there must be found more than a negligent breach of duty. Perhaps minds could differ as to whether a municipality could reasonably anticipate that an unattended two-year-old child would wander into the park and onto the bridge. The concept of liability could be stretched by requiring the operating authority to provide not only a bridge railing, but an impenetrable barrier which could not be scaled to prevent such tragedy. One could also postulate that the entire course of the stream through the park should be likewise fenced with an impenetrable barrier. In short, by stretching common sense it could be said that a municipality must anticipate the unattended presence of two-year-old toddlers and guard against any and all eventualities that might result from their presence. However, I suggest that all such concepts are part and parcel of the concept of ordinary negligence, and not related to willful and wanton conduct.

I would take judicial notice that the state of Idaho is blessed with lakes, streams and water courses both natural and man-made. Federal, state and local units of government maintain recreational areas adjacent thereto for the benefit of the public. There is nothing in the record here to indicate that the water course in question constituted any hidden or concealed danger, nor that it differed in any way from thousands of other locations in this state. The ultimate question which is posed but unanswered by the majority opinion is how any unit of government within this state is to cope with the pronouncement of the majority in this case. The majority, in my view, has converted that which at best is simple negligence, into willful and wanton conduct. I am led to the clear conclusion that the majority disagrees with the legislative limitation of the liability of landowners in the state of Idaho in the public use of public lands for recreational purposes. I dissent.

BISTLINE, Justice concurring and dissenting.

I agree with the majority opinion only with regard to its discussion of liability for

willful and wanton conduct and its remand for further proceedings on that issue. Otherwise, I dissent to its treatment of attractive nuisance and to the application of the recreational trespass statute to city parks.

## I.

With no discussion whatsoever, the majority blandly states that "[t]he doctrine of attractive nuisance in this state does not apply to streams," citing *Bass v. Quinn–Robbins* and *Bicandi v. Boise Payette Lumber Co.* While a little *stare decisis* is a good thing, the above two cases are not worthy of much deference as evidenced by the following pronouncements contained therein:

> Every man who has been brought up with the freedom allowed to American boys knows that you might as well try to dam the Nile with bulrushes as to keep boys away from ponds, pools, and other bodies of water.

*Bicandi v. Boise Payette Lumber, Co.*, 55 Idaho at 551, 44 P.2d at 1111.

> The weight of authority is to the effect that ponds, pools, lakes, streams, reservoirs, and other waters do not constitute attractive nuisances, at least in the absence of any unusual element of danger. *The natural and ordinary perils thereof are usually deemed to be obvious to children of the tenderest years*, and as a general proposition no liability attaches to the proprietor by reason of injury or death resulting therefrom to children who have come upon the land to bathe, skate, or play. 56 Am.Jur. 850.

*Bass v. Quinn–Robbins*, 70 Idaho at 313, 216 P.2d at 949 (emphasis added).

While these statements, which are little but decrees issuing *ipse dixit* from the ivory tower of this Court, may have made pleasant reading in a bygone era, a contemporary reasoning court would either overrule them or apply the specific facts of a case and create appropriate exceptions.

Such a case is before us today in the tragedy of Dustin Jacobsen, a two-year old at the time of his life-altering injury. The leading treatise on torts has observed that while the danger of drowning may be apparent enough to a mature child as to create a general rule of no liability,

> [t]hese fixed rules have been found deficient in certain situations. One is where the possessor of the land knows or has reason to know that the children who are likely to trespass are so extremely young that they cannot appreciate the danger. *When an infant of three or four is known to be in the vicinity of fire or water, or other dangerous conditions, it is 'pure fantasy, straight from outer space'*[1] *to say that he will be fully able to protect himself against them.* The arbitrary categories have also proved unsatisfactory in cases where there is an enhanced risk, greater than the ordinary one normally attending such a condition, as where some part of the danger is hidden, or there is some special, distracting feature, such as a diving board, *or special reason to anticipate trespasses*, such as past experience *or proximity to a place where children congregate.*[2] There are so many of these exceptional cases that many courts have rejected such fixed and arbitrary rules, and said that each case must be considered in the light of all of its particular facts.

Prosser and Keeton on The Law of Torts, 5th ed., 1984, pp. 407–408 (emphasis added).

It is obvious that our hallowed Idaho rule excluding the application of attractive nuisance to streams ought to give way, in the minds of a reasonable court, in the case of a two-year old victim who can hardly be assumed to appreciate the danger of many, if any, hazards. By not tempering this harsh rule in the case of young Dustin Jacobsen, the majority engages in the "pure fantasy, straight from outer space" criticized by the Michigan court in *City of*

---

**1.** Citing Smith, J. in *Elbert v. City of Saginaw,* 363 Mich. 463, 109 N.W.2d 879 (1961).

**2.** Citing *Harris v. Buckeye Irrigation Co.,* 118 Ariz. 498, 578 P.2d·177 (1978) (normal immuni-

ty from attractive nuisance doctrine for irrigation ditch accidents inapplicable to heavily used foot bridge over ditch near high school baseball field and swimming pool).

*Saginaw*[3] and adopted by Prosser and Keeton.

In addition, the facts here establish that the city of Rathdrum located *playground equipment near the ditch* and the bridge over it—facts which the Arizona court in *Harris, supra*, found persuasive enough to withdraw immunity from attractive nuisance liability in the case of a *twelve-year old victim.* This may be the *only* court in the nation to not apply the attractive nuisance doctrine in the face of such compelling facts.

While Idaho allegedly has adopted the attractive nuisance doctrine, today's opinion demonstrates that a majority of this Court is extremely reluctant to apply it to appropriate factual situations. *See also Hughes v. Union Pacific Railroad Co.*, 757 P.2d 1185 (1988). But it has not always been so with all Idaho jurists. More than 50 years ago, Justice Holden established that it was possible for one to occupy a position on this Court without resigning from the human race:

In the case at bar, then, one is compelled to determine whether to align himself with that group of courts which have adopted what has been designated as the "humane" (attractive nuisance) doctrine, or with that other group which have adopted what has been designated as the "hard" doctrine. The "hard" doctrine

---

3. The facts in *City of Saginaw* were very close to those before this Court today. There the city allowed an excavation in a residential street to remain open for 28 days. The pit filled with water four feet deep. The pit was guarded mainly by single planks resting on saw horses. A resident of the neighborhood complained to the city that the pit was a hazard to the numerous small children who lived nearby. A neighborhood boy, Jimmy Elbert, two and one-half years old, wandered away from his mother's supervision and was found soon afterwards floating face down in the pit. He suffered permanent brain damage. The court in *City of Saginaw* reviewed a slightly different issue of law. It considered whether the foreseeability of harm to Jimmy was a matter of law for the court's determination or one of fact appropriate for jury deliberation. The trial court submitted the matter to the jury who returned a defense verdict.

Judge Smith, writing for a plurality, reversed. Even though addressing a marginally different question of law, his impassioned words are appropriate for consideration by today's majority which does not even discuss the reasonableness of the proposition that, as a matter of law, two-year olds are presumed *in Idaho* to be able to appreciate the hazards of water:

Under these circumstances what is the reasonable apprehension as to injury from the hazard created? Here a jury has been permitted to say that no reasonable person would anticipate that an infant might escape from its mother and enter upon the public highway, there to be exposed to danger from this water hole. We, of course, are constantly admonished, while driving, to proceed with caution in residential areas, and, particularly, in the vicinity of schools. We are reminded that every time a ball rolls into the street we are to presume that it is attached to a child, who will follow it, and we are fully aware of the attractiveness of many nuisances to children. For such and related reasons legislative bodies have universally placed laws on the books requiring drivers to slow down in residential areas, and in the vicinity of schools. Why? Because children are apt to get into the streets, where they have no business to be. We of the courts, in turn, have held drivers negligent for not driving with due care in such areas. Why? Because children are apt to get into the streets, where they have no business to be. But here a jury is permitted to say that the water hole in the street imposes no duty of care upon these defendants. Why? Because children are *not* apt to get into the streets, where they have no business to be.

*In short, Justice, in all her majesty and with all her wisdom has been permitted to peer down upon this child standing at her bar and solemnly say to him that the water-filled hole in the public street in front of his home was of no concern to him. If ... he makes bold to ask why, the answer is clear: 'Because to you there is no danger. No reasonable person could ever anticipate that you might escape from your mother and run into the street and fall into the hole.'*

All of this is straight from outer space. It is pure fantasy. It is unrelated to life on this earth. It requires no treatise on child development to tell us that a child 2 years, 8 months of age is as inquisitive as a hornet and as slippery as an eel. Despite the utmost vigilance he will at times, when the mother is cooking, or washing, or caring for others, make his get-away. *Is the situation as to his safety in this event as though he lived on the frontier, or in the jungle, or does modern urban society demand more for its young?* Should the penalty visited upon him, who is not even aware of his fault, exceed the well-known measures of normal family discipline? Or should it include brain damage or death? It is our answer to give, not his.

*Elbert v. City of Saginaw, supra*, 109 N.W.2d at 887 (emphasis added).

puts *property* above *humanity;* on the other hand, the "humane" doctrine puts *humanity* above *property.* *To hold that one who artificially creates and maintains something dangerous on his land, which from its very nature is attractive to children, something which will attract children to it to play just as certainly as a fish is attracted to and mechanically follows a bait, is under no duty to exercise reasonable and ordinary care to protect children from its dangers because they are not given an express invitation, smacks of the barbarous it seems to me.* I do not hesitate, personally, to adopt the rule which places *humanity* above *property,* and gives reasonable protection to children of tender years against dangers which they cannot perceive and appreciate, even though an express invitation may not have been given.

*Bicandi v. Boise Payette Lumber Co.,* *supra,* 55 Idaho at 556, 44 P.2d at 1116 (Holden, J., concurring specially) (citations omitted).

## II.

Also found wanting is the majority's rote recitation of the elements of "Idaho" attractive nuisance which include the requirement that the child be "attracted to the nuisance." Modern courts have discarded this requirement and have instead treated child trespasser law as simple negligence law:

As a logical consequence of the 'attractive' theory, the Supreme Court, in a much criticized opinion of Mr. Justice Holmes, held that a child could not recover when he was not induced to trespass by the presence of the pool of poisoned water that killed him, but discovered it only after he had come upon the land. Thirteen years later the decision apparently was overruled; but in the meantime this limitation on the doctrine had been accepted and followed by a number of other courts. *It has now been rejected by a large majority of courts, and there remain only a handful of jurisdictions which still adhere to it.* Early in the twenties a different theory began

to gain ground as a justification for the liability to the child, which discarded the necessity of allurement, enticement or attraction onto the land, and considered that this was important only in so far as it meant that the trespass was to be anticipated. The basis of the liability was thought to be little more than the foreseeability of harm to the child, and the considerations of social policy which, in other negligence cases, operate to bring about a balancing of the conflicting interests, and to curtail to a reasonable extent the defendant's privilege to act as he sees fit without regard to the effects on others. In other words, child trespasser law began to be viewed as essentially ordinary negligence law, and the fact that the child was a trespasser merely one fact to be taken into account, with others, in determining the defendant's duty, and the care required of him.

\* \* \* \* \* \*

In 1934 the Restatement of Torts, in what has proved to be one of its most effective single sections, threw its support behind the special duty rules for child trespassers. It discarded the idea of allurement to trespass, and defined the 'attractive nuisance' rule in general negligence terms. Section 339, as modified in the Second Restatement, has been cited so frequently, and has received such general acceptance on the part of the courts, that it has become the new point of departure.

Prosser and Keeton, *supra,* pp. 401–402 (emphasis added).

Yet such "modern" developments as the *1934* Restatement of Torts position on "attraction to the nuisance" have not penetrated into darkest Idaho. *See Hughes v. Union Pacific Railroad Co.,* 757 P.2d 1185 (1988). This, along with the continued adherence to the unreasoning and unreasonable blanket rule that attractive nuisance liability does not extend to water, casts considerable doubt upon my personal goal that our homegrown Idaho jurisprudence will enter the Twentieth Century by the year 2000.

### III.

My final area of disagreement with the majority is its application of the recreational trespass statute to a city park. It is due to the application of the statute here that Dustin Jacobsen and his mother must resort to arguing attractive nuisance and wanton or willful conduct rather than ordinary negligence law. My thoughts on the matter have been expressed fully in my dissent to *McGhee v. City of Glenns Ferry*, 111 Idaho 921, 729 P.2d 396 (1986), with Justice Huntley in full accord. How a child, as a member of the public whom the city *invites* to use a city park, can be considered a recreational *trespasser* is beyond the reasoning power of rational minds, mine included. Apparently this obvious paradox has not troubled the calm contemplation of the majority.

Yet, curiously, the *McGhee* decision is not cited by the majority today. The author of the Court's opinion has properly avoided utilizing it as one would the plague. In fact, *McGhee* has not yet been cited by this Court since it unfortunately materialized out of whole cloth, despite the fact that the majority has had two opportunities, today included, to do so. *Rice v. Miniver*, 112 Idaho 1069, 739 P.2d 368 (1987) (*McGhee* cited in dissent by Bistline, J.). *McGhee* was also snubbed by the Ninth Circuit Court of Appeals when it considered the applicability of our recreational trespass statute. *Seyler v. U.S.*, 832 F.2d 120 (9th Cir.1987). In fact, a computer search reveals that, to date, not a single majority opinion of any court, including this one, has relied upon the *McGhee* majority opinion or even acknowledged its existence.

Contrast that with the subsequent history of a contemporaneous [4] opinion from the high court of the state of New york, *Ferres v. City of New Rochelle*, 68 N.Y.2d 446, 510 N.Y.S.2d 57, 502 N.E.2d 972 (1986). There a unanimous (7–0) court held that a similar New York recreational *trespass* statute could not be applied to a city park which the public was *invited* to use.

From its wording and an analysis of the statutory scheme, the sole purpose of General Obligations Law § 9–103 [5] is evident—to induce property owners, who might otherwise be reluctant to do so for fear of liability, to permit persons to come on their property to pursue specified activities. General Obligations Law § 9–103 offers two inducements to the property owner to give such permission: (1) the broad grant of immunity from liability conferred in subdivision (1)(a) (absolving the owner of the 'duty to keep the premises safe for entry or use by others' and of the duty 'to give warning of any hazardous condition') and (2) the assurance provided in subdivision (1)(b) (that by giving permission to use his property the owner does not, by that act, assure 'that the premises are safe' or 'constitute the person to whom permission is granted an invitee to whom a duty of care is owed'). *It would be contrary to reason to assume that the Legislature could have intended that the statute apply in circumstances where neither the basic purpose of the statute, nor, indeed, any purpose could be served—as in the case of the supervised park here where the municipality has already held its recreational facility open to the public and needs no encouragement to do so from the prospective immunity offered by the statute.*

Moreover, subdivision (1)(b)—to have any meaning and effect—could not have been intended to apply here. Subdivision (1)(b) provides an additional incentive to the property owner by assuring him, among other things, that in giving permission for use of his property he does not 'constitute the person to whom permission is granted *an invitee to whom a duty of care is owed* ' (General Obligations Law § 9–103[I][b]; emphasis added).

The Legislature can hardly have intended to grant this additional assurance afforded by subdivision (1)(b) where it would be superfluous and could serve no

---

4. One day apart.

5. The New York statute is similar to our recreational trespass statute, I.C. § 36–1604.

purpose, i.e., where the owner, like defendant here, has already encouraged public use and assumed the duty of reasonable care in the operation of its park. (citations omitted).

\* \* \* \* \* \*

[The statute] does not provide immunity to a municipality, which, irrespective of any inducement contained in General Obligations Law § 9–103, already operates and maintains a supervised facility, such as defendant's, for use by the public. *Nothing in the wording of General Obligations Law § 9–103 or its history supports defendant's construction which results in a drastic reduction in a municipality's responsibility in the operation and maintenance of its supervised parks, and serves no discernible public interest,* certainly not one consistent with the stated aim of section 9–103: encouraging a landowner to permit persons to come upon his property for the purpose of hunting, fishing and other outdoor recreational activities. (citations omitted).

*Ferres, supra,* 510 N.Y.S.2d pp. 60–61, 62, 502 N.E.2d pp. 975–76, 977 (emphasis added).

The reasoning and unshakable logic of this position taken by one of the leading state appellate courts of this nation has been cited no less than eleven times by the courts of its own state, *see, e.g., Leonakis v. State,* 126 A.D.2d 706, 511 N.Y.S.2d 119 (1987); *Meyer v. County of Orange,* 129 A.D.2d 688, 514 N.Y.S.2d 450 (1987), twice by other jurisdictions, *Caley v. City of Canton,* Slip Op. No. 7262, Filed December 21, 1987 (Ohio App.1987) [available on WESTLAW, 1987 WL 31686] (LEXIS); *Fastow v. Burleigh County Water Resource District,* 415 N.W.2d 505 (N.D. 1987), and once in Idaho. *Rice v. Miniver, supra.*

Is it any wonder that *McGhee* has never been cited by a majority opinion anywhere in the nation? No, wonder at all. It champions an absurd statement of law— that *a child invited* to use a city park open to the public *is a trespasser of genus "recreational."* One well understands why today's majority does not mention *McGhee*—such a monument of Idaho jurisprudence at its lowest.

As the saying goes in the vernacular, "use it or lose it," which expressed in judicial parlance is "rely on it or overrule it." How long will this Court leave *McGhee* on the books as a thorn in the side of conscientious judges and striving attorneys is anyone's guess.

Today's majority opinion, while it is a vast improvement as compared to *McGhee,* is not to be overly commended. It puts this toddler's lawsuit in the disadvantaged position of being, believe it or not, a trespasser obliged to prove willful or wanton misconduct on the part of the city, whereas the little fellow had not the capability of being a trespasser, and was in fact an invitee to whom the city owed the duty of care due to all invitees.

## IV.

The special concurring opinion of Justice Bakes serves to explain that which I have mentioned and criticized in parts I, II, and III of this opinion, *i.e.,* he makes the effort of insuring that the trial court is aware that, "The plaintiff's burden of proof in this case, *i.e.,* proof that the city's actions constituted 'willful and wanton misconduct,' IDJI 225, is greater than proving mere ordinary negligence and, accordingly, the factual record must be evaluated based on that higher standard." He goes on to add that the record in Dustin Jacobsen's case, "is a very close call as to whether or not the plaintiff's affidavits alleged sufficient misconduct on the part of the city to raise a triable issue of fact of whether or not the city's conduct was 'willful and wanton' within the meaning of the law as outlined in the Court's opinion today."

It is probably within bounds for Justice Bakes to surmise that the trial judge needs a refresher course on the law in order to rule properly at trial. I do not agree. Nor do I see any valid reason for him to add that the issue is close, *after* he has agreed with a result which is to give the child a day in court.

What most practitioners will make out of the second sentence is that it serves only as lead-in to his gratuitous advice telling the trial judge all about motions for directed verdict and motions for judgment n.o.v.

As an appellate judge I am grateful for the further gratuity as to this Court's function on appeal.

Hopefully little Dustin and his mother will not be frightened out of court.